## WADSWORTH v. SUPERVISORS.

The rulings in *Aspinwall et al.* v. *Commissioners of the County of Daviess* (22 How. 364) reaffirmed and applied to this case.

APPEAL from the Circuit Court of the United States for the Western District of Wisconsin.

The facts are stated in the opinion of the court.

The case was argued by *Mr. Matthew H. Carpenter* for the appellant, and by *Mr. W. P. Bartlett* for the appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

By an act of the legislature of Wisconsin, approved April 1, 1864, the legal voters of certain counties, among which are the counties of Eau Claire and St. Croix, were authorized to vote upon the subject of municipal aid in the construction of a railroad from Tomah to Lake St. Croix, by the Tomah and Lake St. Croix Railroad Company, subsequently called the West Wisconsin Railway Company.

The act declared that "if a majority of the ballots cast in any of said counties be for railroad aid, the county board of supervisors of said counties shall have power, by resolution, to cause to be issued bonds of the denomination of one hundred to one thousand dollars each, to an amount not exceeding $50,000 for each of said counties, payable thirty years after the date thereof, with interest at the rate of seven per cent, payable semi-annually in the city of New York, at such place as the treasurer of the State shall designate." The board of supervisors of each of the counties voting such aid were required to "annually cause to be levied and collected, as other State and county taxes are collected, a sum of money sufficient to pay the interest accruing and existing by reason of the bonds which either of said counties *may* issue, at the rate aforesaid, and such further amount to defray any expense attending the payment of such interest."

The act further provided that "the said bonds, when authorized to be issued as aforesaid, shall be *held* by the county

board of supervisors of each of said counties, and the same, or the avails thereof, shall be expended in the counties which issue the same (provided the railroad passes through the said county), in the grading of said railroad, or in the purchase of ties therefor; and the said bonds shall be delivered to the said railroad company when the board of supervisors of each of said counties are satisfied that the same will be applied for such purpose."

On the 5th of November, 1867, an election was held in the county of Eau Claire, at which a majority of votes were cast in favor of aid, to the extent of $50,000, to the Tomah and Lake St. Croix Railroad Company. The road was constructed through the county prior to March 10, 1870, but it does not appear when the work of such construction was commenced. The entire road was, however, fully constructed on or about Dec. 1, 1871, since which date it has been operated as a railway.

On and prior to March 15, 1870, the company demanded of the board of supervisors for the county of Eau Claire, county bonds to the amount of $50,000, and payable as required by the statute. The board refused to comply with that demand, and made the following record of such refusal, viz.: "The county board of supervisors of Eau Claire County met at the office of the clerk, all members present. The board took up the subject of issuing the bonds of the county to the West Wisconsin Railroad Company as voted in 1867, and expressed themselves as willing to issue the bonds of the county if they could be paid by a tax as understood at the time the vote was taken, but as our highest courts have decided that it is illegal to levy and collect a tax to pay such bonds, they refuse to issue them. They are unwilling to issue the bonds of the county which cannot be paid, but must be repudiated in the end, for the reason that it would be unjust to the bondholder, and a disgrace to the county, and requested the county board of supervisors of said county to cause said bonds to be issued and delivered to the said company as required by law and the aforesaid vote of the electors of said county."

There is some confusion in the language employed in this minute of the proceedings of the county board, but there can

be no doubt, as to the grounds upon which it refused to execute and deliver the bonds.

By an act approved March 25, 1872, so much of the act of April 1, 1864, as authorized the counties of St. Croix and Eau Claire to issue bonds in aid of the construction of a railroad from Tomah to Lake St. Croix was *repealed.*

On or about Sept. 1, 1875, the railroad company, for a valuable consideration, assigned and transferred to Wadsworth all and every cause of action, in law or equity, it then had, or to which it was entitled, against the county of Eau Claire, by reason of the failure and refusal of its board of supervisors to issue and deliver county bonds in accordance with the vote of the people.

The object of the present suit in equity, by Wadsworth as assignee of the company, is to compel the execution and delivery to him of such bonds. To the bill filed a demurrer was sustained, and a decree entered for the defendants.

In the view which the court takes of this case, it may be assumed that due notice was given of the election held on the 5th of November, 1867.

The main question then presented is, whether the county of Eau Claire ever came under a legal obligation to execute and deliver to the railroad company, county bonds to aid, in the construction of the road from Tomah to Lake St. Croix? The decision of that question, it seems to the court, is controlled by the principles announced in *Aspinwall, &c.* v. *Commissioners, &c*, 22 How. 364. That case involved the validity of certain county bonds which were in the hands of *bona fide* holders for value, having been issued by the board of commissioners for Daviess County, Indiana, in payment of a subscription made in behalf of the county to the capital stock of an incorporated railroad company. The subscription was made under the sanction of a popular vote and in conformity with the charter of the railroad company, which made it the duty of the commissioners to subscribe for the stock and issue bonds in payment thereof, whenever a majority of qualified voters of the county, at an election held for that purpose, should declare in favor of such subscription.

It, however, appeared that after the people had voted in

favor of the subscription, but before any subscription was in fact made, a new constitution for Indiana went into operation, containing, among others, the provision that "no county shall subscribe for stock in any incorporated company, unless the same be paid for at the time of such subscription; nor shall any county loan its credit to any incorporated company; nor borrow money for the purpose of taking stock in any such company."

It was argued in that case, that as the statute under which the election was held made it the duty of the commissioners to subscribe for the stock and issue county bonds in payment thereof, the right of the railroad company to receive the bonds became complete and perfect when a majority of legal voters declared in favor of the subscription; and that such right was not, and consistently with the contract clause of the national Constitution could not be, affected by any subsequent changes in the organic law of the State. To that position this court was unable to give its assent. The reluctance expressed in its opinion is not to be construed as implying doubt as to the correctness of the legal conclusions there reached, but only as referring to the fact that the bonds in suit were in the hands of those who, for aught that appeared, had purchased them in the belief that they were valid obligations of the county. We held in that case that the popular vote did not itself create a vested right in the railroad company to the bonds, and that a subscription was necessary to create a contract binding the county to issue bonds in payment of the stock, and binding the company to issue stock for the bonds. "Until the subscription is made," said Mr. Justice Nelson, speaking for the whole court, "the contract is unexecuted and obligatory upon neither party." Hence, the new State Constitution was held to govern the case, and from the time of its adoption to have withdrawn from the county commissioners all authority to make subscriptions to the stock of incorporated companies, except in the manner and under the circumstances prescribed by that instrument.

Applying the doctrines announced in *Aspinwall, &c.* v. *Commissioners, &c.*, to the present case, it is clear that there was no binding agreement or contract between the railroad com-

pany and the county of Eau Claire, by which the latter became legally bound, through its board of supervisors, to execute and deliver bonds to aid in the construction of the road from Tomah to Lake St: Croix. The act of April 1, 1864, neither in express words nor by necessary implication, made it imperative upon the board of supervisors to issue bonds in pursuance of the popular vote. The act was an enabling one, and its legal effect was to invest the board with power to supplement the expressed will of the people by an issue of bonds. We find nothing in its provisions justifying the conclusion that the popular vote was to be taken as an absolute direction that the supervisors should issue the bonds, at all events, and without regard to the circumstances intervening after the people had voted in favor of county aid to the enterprise in question.

It will be observed that the act of 1864 did not contemplate a subscription of stock upon the part of the county, but simply a donation of bonds to aid in the construction of the road. We can understand why the legislature might invest the constituted authorities of the county with large discretion as to the exercise of a power to issue bonds by way merely of donation to aid in the construction of a railroad. But whether sound policy indicated such a course, it is not material to inquire, since our duty is to ascertain the legislative intent, and, if possible and consistent with the law, to give it effect according to the reasonable interpretation of the words employed to express that intent.

As the statute only declared that the supervisors should have *power*, by resolution, to cause bonds to be issued when the people voted in favor of railroad aid, we are not at liberty to say that the legislature meant such vote to be a positive command to exercise that power without regard to the circumstances arising after the expression of the popular will.

But if we should be mistaken in this construction of the statute,—if the statute had, in terms, made it the duty of the supervisors to issue bonds, to the extent indicated by the popular vote, — we should feel bound, upon the authority of *Aspinwall, &c.* v. *Commissioners, &c.,* to hold that the legislature could, at any time before the bonds were in fact issued, or before the county came under a legal obligation to issue them, repeal, as

it did, the statute conferring the power to issue, and thereby withdraw from the supervisors all authority in the premises. The election at which the people gave their sanction to railroad aid had, as we have seen, no other effect than to confer power upon the supervisors to issue bonds, and did not place them under any legal obligation to the railroad company to exercise the power granted. The railroad company had not, prior to the passage of the act of 1872, acquired any perfect or vested right to the donation. The repealing statute of 1864 was, under the circumstances, a total abrogation or obliteration of the law repealed, as much so as if the latter had never existed.

We have not overlooked the averments in the bill that the company constructed its road through Eau Claire County at a cost, in grading and in the purchase of ties, exceeding the sum of $50,000 ; that such work was done, and such money expended upon the faith of the aid voted, and with " the full understanding and belief " that the bonds would be issued and delivered to the company ; and that the company would not have built the road and expended the money except in reliance upon an issue of the bonds as authorized by the statute.

With whom such understanding was had, and upon what special facts such belief was based, does not appear from any specific allegations in the bill. The seventh section of the act of 1864 directed that the bonds, " when authorized to be issued as aforesaid," that is, when issued under the power conferred by popular election, should be held by the supervisors, and not delivered until they should be satisfied that the proceeds would be expended in the grading of the road in the county issuing them, or in the purchase of ties therefor. Had the bonds been in fact executed before the act of 1872, but retained by the supervisors under an agreement for their delivery when the purposes indicated by the section just cited had been met, there might have been some ground for holding that the power given by the statute to issue the bonds had been finally and fully exercised by the supervisors, and that, in such case, the railroad company would have been entitled to enforce their delivery, upon the completion of the road through the county, or after the expenditure of an equal amount, either in the grading of

the part of the road which lay in that county, or in the purchase of ties therefor. But we have seen that the bonds had not in fact, been executed, when the power to issue and deliver them was withdrawn by the legislature. The discretion conferred upon the supervisors had not then been exercised. If the company chose to enter upon the work of construction in the county before the supervisors had, in fact, elected to exert the power conferred by the statute, and without any agreement, upon sufficient consideration, binding the county to execute and deliver the bonds, their understanding, however induced, and their belief, upon whatever facts based, that the bonds would, at some future time, be issued and delivered, could not trammel the power of the legislature, or prevent it from withdrawing the authority conferred upon the supervisors in the act of 1864.

Nor do we think it at all material in the determination of this case that the supervisors expressed upon their records a willingness to issue the bonds, and that they were restrained from so doing by the circumstance that the Supreme Court of Wisconsin had judicially declared that the payment of the bonds, if issued, could not be enforced. The cases in that court to which, as we suppose, the supervisors referred were *Curtis* v. *Whipple* (24 Wis. 350) and *Whiting* v. *The Sheboygan & Fond du Lac Railroad Co., &c.* (25 id. 167), in the former of which, decided in 1869, it was held that the legislature had no power to raise money, or to authorize it to be raised, by taxation, for the purpose of donating it to a private educational institution; and in the latter, decided in 1870, that no such power existed to make a donation in aid of the construction of a railroad owned, managed, and operated by a corporation in all respects private, except that in its behalf the power of eminent domain might be exercised, and except also that it was charged with certain public duties and was subject to certain public uses. Notwithstanding the reasons assigned by the supervisors for the non-issue of the bonds, the fact remained that they did not, prior to the repealing act of 1872, assume to impose any legal obligation upon the county, either by an actual issue of the bonds, or by an agreement to issue and deliver them upon the completion of the road through the

county.  Under this view of the case we need not consider the question, suggested by counsel, as to how far the rights of parties are to be controlled by the decisions of the Supreme Court of the State, rendered after the election of 1867, upon the subject of municipal donations to railroad and other private corporations.

What has been said is sufficient to dispose of the case.

The decree below sustaining the demurrer was correct, and is

*Affirmed.*