**RIDGEWOOD DEVELOPMENT COMPANY, Respondent,**

v.

**STATE of Minnesota et al., Appellants.**

**No. 50732.**

Supreme Court of Minnesota.

May 30, 1980.

---

2.   See *Sargent v. Johnson*, 601 F.2d 964 (8th Cir. 1979).

Warren Spannaus, Atty. Gen., Gregory P. Huwe, Sp. Asst. Atty. Gen., St. Paul, for appellants.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for respondent.

SHERAN, Chief Justice.

At issue in this case is the effect of the 1979 amendment of Minn.Stat. ch. 474 (1978) on the ability of Ridgewood Development Company to finance its development of an 180-acre tract of land in Burnsville, Minnesota for single and multiple family dwellings with approximately $30 million of municipal industrial development revenue bonds. The State of Minnesota, its Commissioner of Securities and its Commissioner of the Department of Revenue appeal from a grant of summary judgment to plaintiff Ridgewood Development Company estopping the state from enforcing the provisions of 1979 Minn. Laws, ch. 306 with regard to the Ridgewood Residential Development Project and holding that this Project remains subject to the provisions of Minn.Stat. ch. 474 (1978). Because the

plaintiff in these declaratory judgment proceedings has failed to establish the necessary elements of its claim for equitable estoppel—governmental inducement, that its reliance on the continued existence of Minn.Stat. ch. 474 (1978) was reasonable, and an irrevocable commitment of its resources—we reverse.

The Municipal Industrial Development Act, codified in Minn.Stat. ch. 474 (1978), was enacted in 1967 to facilitate the "active promotion, attraction, encouragement, and development of economically sound industry and commerce [by local governmental units] for the purpose of preventing, so far as possible, the emergence of blighted and marginal lands and areas of chronic unemployment." § 474.01, subd. 2. In order to finance such projects, § 474.12 authorized municipalities and redevelopment agencies to issue revenue bonds whose interest, for tax purposes, is excluded from gross income. Before a municipality could undertake any project, it had to be submitted to the Commissioner of Securities for approval. He is required by statute to determine that the project tends to further the purpose and policies of the Act, but this approval "shall not be deemed to be an approval by [him] or the state of the feasibility of the project or the terms of the revenue agreement * * *." § 474.01, subd. 7a.

Only certain kinds of redevelopment projects can receive the benefit of this tax-exempt financing. Section 474.02, subd. 1 includes a general definition—"any properties, real or personal, used or useful in connection with a revenue producing enterprise"—and also lists a number of specific activities that are to be considered projects for purposes of the Act. The construction of residential housing is not one of them.

In 1979 the legislature, concerned about the recent uncontrolled proliferation of projects being financed through the issuance of tax-exempt municipal bonds, amended the Minnesota Industrial Development Act. 1979 Minn. Laws, ch. 306.[1]

1. Chapter 306 is described as "[a]n Act relating to municipal development; limiting the objects

and methods of financing residential, industrial, and economic development * * *."

Chapter 306 expressly excludes from the definition of "project" "any housing facility to be rented or used as a permanent residence," § 11, but protects from the operation of the amendments through a grandfather clause certain projects in an advanced state of planning, § 14. Thus, multifamily rental projects approved by the Commissioner of Securities prior to April 17, 1979 could proceed under the old Law, § 14, subd. 2, as could single family housing projects in Coon Rapids and Vadnais Heights if they complied with the conditions aimed at ensuring that most of the housing would be available to low and middle income persons, § 14, subd. 3.

Ridgewood Development Company, a general partnership, was organized on November 1, 1978 to develop an 180-acre tract for single and multiple family residential living by taking advantage of the financing provisions of the Minnesota Industrial Development Act. Five days later it paid $25,000 for an option to buy the land, and it sought and received from the Burnsville City Council preliminary approval of both its development project and its request that the project be financed with approximately $30 million of tax-exempt municipal revenue bonds. The city then applied to the Commissioner of Securities for approval of the Project, which was granted on November 24, 1978. In response, Ridgewood exercised its option on December 27, 1978 and entered a contract for deed for the purchase of the 180-acre tract for $1,719,798.[2] On April 16, 1979, the Burnsville City Council approved the planned unit development proposal. Prior to commencing construction, however, Ridgewood still needed to obtain a development contract and individual building permits and to arrange for the city to sign the contract for the issuance of municipal industrial development revenue bonds.

Ridgewood filed this action on July 26, 1979, alleging that the enactment of Chapter 306 made it financially impossible for it to proceed with its project and seeking a declaratory judgment that Chapter 306 was inapplicable or that it was unconstitutional as applied. Ridgewood argued that since it had relied on the provisions of Minn.Stat. ch. 474 (1978) prior to amendment by the 1979 legislature, it had the right to finance its project through tax-exempt industrial revenue bonds, as originally contemplated. Ruling on cross-motions for summary judgment, the trial court held that the State of Minnesota was equitably estopped from applying Chapter 306 to plaintiff's project.

This appeal raises the following issues for decision:

1. Whether Ridgewood's reliance on the provisions of Minn.Stat. ch. 474 (1978) was reasonable such that the State of Minnesota should be estopped from applying the provisions of the 1979 amendment to the Ridgewood Residential Development Project.

2. Whether Ridgewood acquired a vested right to complete its project with tax-exempt financing.

1. Until recently in Minnesota, the remedy of equitable estoppel was available against a governmental unit only if it were acting in a proprietary capacity. In *Mesaba Aviation Div. v. County of Itasca*, 258 N.W.2d 877 (Minn.1977), however, we rejected the governmental-proprietary distinction as a test of the circumstances under which the government could be estopped and held that, when a party raises a claim of equitable estoppel, "the equities of the circumstances must be examined and the government estopped if justice so requires, weighing in that determination the public interest frustrated by the estoppel."

**2.** At oral argument, the parties agreed that Ridgewood had expended over $250,000 in reliance on the provisions of Minn.Stat. ch. 474 (1978). Based on affidavits of the partners, this would appear to include a downpayment of $50,000 on the land and an additional $175,-655.64 on the contract for deed, as well as over $30,000 in costs for the preparation of necessary documents. Not counted are the 300 to 400 hours of promotional activities by the partners themselves. These estimates, however, do not separate promotional from reliance expenses. *See* discussion at p. 292 *infra*.

*Id.* at 880. We cautioned that estoppel would only be applied against the government acting in a sovereign capacity "if the *equities advanced by the individual* are sufficiently great." *Id.* (emphasis added) Thus, under our reasoning in *Mesaba Aviation*, a plaintiff, to prevail against a government entity, has a heavy burden of proof.

▇▇ As a general rule, for equitable estoppel to lie, the plaintiff must demonstrate that the defendant, through his language or conduct, induced the plaintiff to rely, in good faith, on this language or conduct to his injury, detriment or prejudice. 3 J. Pomeroy, Equity Jurisprudence § 805, at 191–92 (5th ed. 1941); *United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970); *Tiffany, Inc. v. W.M.K. Transit Mix, Inc.*, 16 Ariz.App. 415, 493 P.2d 1220 (1972); *Kojro v. Sikorski*, 267 A.2d 603 (Del.Super.1970). Thus, before a court will examine the conduct of the party sought to be estopped, the seeker of the equitable remedy must demonstrate that he suffered some loss through his reasonable reliance on that conduct. As one commentator states the rule that is generally applied in land regulation cases:

> A local government exercising its zoning powers will be estopped when a property owner, (1) relying in good faith (2) upon some act or omission of the government, (3) has made such a substantial change in position or *incurred such extensive obligations and expenses* that it would be *highly inequitable* and unjust to destroy the rights which he ostensibly had acquired.

Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes*, 1971 Urb.L.Ann. 63, 66 (emphasis added). Stated somewhat differently, before plaintiff can be said to have made a significant investment deserving of judicial protection

in a land use case, he must demonstrate expenditures that are unique to the proposed project and would not be otherwise usable. *Hawkinson v. County of Itasca*, 304 Minn. 367, 372–73, 231 N.W.2d 279, 282 (1975); *Spindler Realty Corp. v. Monning*, 243 Cal.App.2d 255, 261, 53 Cal.Rptr. 7, 10, *cert. denied*, 385 U.S. 975, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966); *Clackamas County v. Holmes*, 265 Or. 193, 198, 508 P.2d 190, 192 (1973). *See generally* Cunningham & Kremer, *Vested Rights, Estoppel, and the Land Development Process*, 29 Hastings L.J. 623, 714–29 (1978).

▇▇ Both parties to this appeal agreed at oral argument that Ridgewood Development Company expended over $250,000 in preparing for the construction project. There is nothing in the record, however, that suggests that all of these preparatory expenses were incurred in reliance[3] on Minn.Stat. ch. 474 (1978) or that the actual reliance expenses are irrevocably lost if the project cannot be funded through the issuance of industrial revenue bonds. There is a tendency for the value of land to increase, and Ridgewood has not demonstrated that there is no other way in which the land can be profitably used.

Were this the only error, we would remand to the trial court for a determination of this material issue of fact. *Greaton v. Enich*, 290 Minn. 74, 185 N.W.2d 876 (1971); *Minneapolis-St. P. & S. Ste. M. R.R. v. St. Paul Mercury Indemnity Co.*, 268 Minn. 390, 406, 129 N.W.2d 777, 788 (1964). For the reasons delineated below, however, we hold that, under the circumstances of this case, equitable estoppel is an inappropriate remedy as a matter of law.

▇▇ Although this issue is not directly addressed in the Minnesota cases, other jurisdictions generally require some fault by the government agency whose action is

---

**3.** One of the problems with the affidavits of Ridgewood's partners submitted to the trial court is that they fail to distinguish between those costs associated with the purchase of land for any development purpose and those that were incurred to meet specific requirements of the Act. They also fail to distinguish

between expenses incurred prior to the approval of the Commissioner of Securities and prior to the approval of the development plan on April 16, 1979. None of these can really be considered reliance expenses; instead they must all be viewed as promotional.

sought to be estopped.[4]  *See, e. g., United States v. Georgia-Pacific Co.*, 421 F.2d 92, 97 (9th Cir. 1970); *Rio Delta Land Co. v. Johnson*, 475 S.W.2d 346, 350 (Tex.Civ.App. 1971). According to the basic treatise on equity, inducement is central to the concept of equitable estoppel, a judicial remedy in which one party to a controversy is precluded because of some *improper action on his part* from asserting a particular claim or defense, even one with merit. 3 J. Pomeroy, Equity Jurisprudence § 804, at 189 (5th ed. 1941). As the Ninth Circuit Court of Appeals recently explained the doctrine:

> [E]stoppel is available as a defense against the government if the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel. This proposition is true even if the government is acting in a capacity that has traditionally been described as sovereign (as distinguished from proprietary) although we may be more reluctant to estop the government when it is acting in this capacity.

*United States v. Lazy FC Ranch*, 481 F.2d 985, 989 (9th Cir. 1973) (citations omitted).

■ Under the test posited in *Lazy FC Ranch*, the court must first look for the government's wrongful conduct. Only if it is found to exist does the balancing begin. Here there is no wrongful governmental conduct; no governmental official has given improper advice. Instead, what is being challenged is merely a clarification of governmental policy toward the use of tax-exempt bond financing of housing developments. The actions of elected representatives taken to ensure that legislation is applied in conformity with its underlying purpose can hardly be characterized as "wrongful conduct." Thus, the most important element of equitable estoppel is missing.

Moreover, a court's attempt to negate the application of legislation on other than constitutional grounds[5] creates serious separation of powers problems. In *Huntt v. Gov't of Virgin Islands*, 382 F.2d 38 (3d Cir. 1967), the Court of Appeals held that the district court could not invade the jurisdiction of another department of government in matters of policy and that, although the legislature had already authorized the issuance of revenue bonds and the developer had expended more than $29,000 and substantial time in reliance on the legislative authorization, it could rescind its authorization when it later decided that the construction of this hotel would not promote the economic development of the Virgin Islands. In chastizing the district court's order of specific performance, the court noted:

> We should think that a court of law and equity would hesitate to interfere in the performance by a legislative body of its political and policy decisions which, in the absence of evidence of taint or fraud, have as their primary, if not sole, objective, the general well-being of the community they are selected to represent. In our view, only the most compelling reasons and the clear necessity to avoid the most unconscionable results could, if at all, sustain the substitution by the court of its judgment for that which is committed to the discretion of the legislative organ.

*Id.* at 44.

For these reasons, we hold that the trial court erred as a matter of law in equitably estopping the state from applying the provisions of Chapter 306 to Ridgewood's residential development project.

Although the change in the law interfered with a reasonable expectation of profit by the developer, we believe that the doctrine of equitable estoppel, which, in the

---

4. This requirement appears by implication in *Mesaba Aviation Div. v. County of Itasca*, 258 N.W.2d 877, 880 (Minn.1977). "Reliance * * * alone is not determinative of a special equity. It is the county's dual role as advisor and adversary in the negotiations that appears unfair."

5. Although the plaintiff sought a determination that the enactment violated the contract clause of the United States Constitution or that it unconstitutionally interfered with its vested right, the trial court based its decision on neither of these grounds.

past was not applicable to state government, must be used sparingly by the courts. *Mesaba Aviation Div. v. County of Itasca*, 258 N.W.2d 877, 880 (Minn.1977). It should not be so far extended as to give private entrepreneurs a judicially-protected right to insist that the state continue to make favorable financing available so that an expectation of substantial profit can be realized.

2. Ridgewood also argues that through its substantial expenditures and actions taken pursuant to Minn.Stat. ch. 474 (1978), it had acquired a vested right to finance its construction project through the issuance of tax-exempt municipal bonds which the government could not take away with the 1979 amendments. If Ridgewood has acquired such a right, we would have to construe Chapter 306 to apply only prospectively. *See Holen v. Minneapolis-St. Paul Metropolitan Airports Comm'n*, 250 Minn. 130, 84 N.W.2d 282 (1957) (retrospective legislation is constitutionally prohibited when it divests a private vested interest).

The vested rights doctrine in Minnesota developed to deal not with public funding of private ventures but with state control over private development through the use of zoning provisions and building permits. *See Hawkinson v. County of Itasca*, 304 Minn. 367, 231 N.W.2d 279 (1975); *State ex rel. Berndt v. Iten*, 259 Minn. 77, 106 N.W.2d 366 (1960); *Kiges v. City of St. Paul*, 240 Minn. 522, 62 N.W.2d 363 (1953). Nevertheless, it and equitable estoppel are used by the courts here and elsewhere as alternative ways of resolving developer-government relations in the land use context. *See generally* Cunningham & Kremer, *Vested Rights, Estoppel, and the Land Development Process*, 29 Hastings L.J. 623 (1978). The major difference between the doctrines concerns the court's focus. While a court applying a theory of equitable estoppel investigates the loss to the developer if he is not permitted to finish his project, in vested rights analysis the court asks whether a developer has progressed sufficiently with his construction to acquire a vested right to complete it. *Compare Sullivan v. Credit River Township*, 299 Minn. 170, 217 N.W.2d 502 (1974) *with Hawkinson*

*v. County of Itasca*, 304 Minn. 367, 231 N.W.2d 279 (1975).

■ The general rule in Minnesota is that a right becomes vested when it has "arisen upon a contract, or transaction in the nature of a contract, authorized by statute and liabilities under that right have been so far determined that nothing remains to be done by the party asserting it * * *." *Yaeger v. Delano Granite Works*, 250 Minn. 303, 307, 84 N.W.2d 363, 366 (1957). Nevertheless, in zoning cases decided under this theory, we have held that the mere possession of a building permit, the incurring of some expense and the assumption of obligations preliminary to construction, such as excavation, create no vested right. *Kiges v. City of St. Paul*, 240 Minn. 522, 538, 62 N.W.2d 363, 373 (1953). Neither do expenditures associated with the acquisition of the property, the removal of trees, the grading of the land or excavation. *Hawkinson v. County of Itasca*, 304 Minn. 367, 374–77, 231 N.W.2d 279, 283–84 (1975).

■ Using this standard, it is clear that Ridgewood acquired no vested right to complete its development project under the pre-1979 law. The issuance of the municipal bonds had not been finalized, and there was no contract between Ridgewood and the state, an administrative subdivision or a municipality. The approval of the Burnsville City Council was merely preliminary, while the approval of the Commissioner of Securities carried with it only the implication that the proposed plan was consistent with the purposes of the Act. Because Ridgewood had no contract with anyone, had received no building permits and had not begun actual construction, under our past case law, the legislature could change the law without infringing on a vested right.

■ This case, however, should not really be analyzed under our zoning precedents. Zoning ordinance changes restrict the rights of a property owner, while the legislation at issue here accords to a select group a very special privilege. It has long been accepted that there are no vested rights in privileges

granted by statute. *Anthony v. Veatch*, 189 Or. 462, 220 P.2d 493, 221 P.2d 575 (1950), *appeal dismissed*, 340 U.S. 923, 71 S.Ct. 499, 95 L.Ed. 667 (1951); *Stott v. Stott Realty Co.*, 288 Mich. 35, 284 N.W. 635 (1939). *See also Pearsall v. Great N. Ry.*, 161 U.S. 646, 16 S.Ct. 705, 40 L.Ed. 838 (1896); *Wadsworth v. Supervisors*, 102 U.S. 534, 26 L.Ed. 221 (1880); *Aspinwall v. Comm'rs*, 22 How. 364, 16 L.Ed. 296 (1859); *Huntt v. Gov't of Virgin Islands*, 382 F.2d 38 (3d Cir. 1967). As the court stated in *Pearsall*:

> [I]t has always been held that the legislature may repeal laws authorizing municipal subscriptions to railways, though such laws were in existence at the time the railway was chartered, and may be supposed to have influenced the promoters and stockholders of the road in undertaking its construction. And, even if there has been a public vote in favor of such subscription, such vote does not itself form a contract with the railway company protected by the Constitution, the court holding that until the subscription is actually made the contract is unexecuted.

161 U.S. at 666, 16 S.Ct. at 710.

The legislature, as representative of the people of Minnesota, should certainly be able to "trim its sails" if it appears that an undertaking intended to benefit the public interest is being used for other purposes. Thus, a statute aimed at eliminating urban blight, providing housing for low income groups, or encouraging the construction of multiple housing where such housing is needed should not be used to permit low cost financing for developers engaged in the competitive business of erecting living accommodations for the affluent. Indeed, it is doubtful whether the legislature has controlling authority to permit public credit to be used for such a purpose. If it does, however, such authority is marginal, and, based on its experience with a particular law, the legislature should be able to eliminate the public subsidy of ventures so clearly private and profit-motivated as the one here involved, without being liable to private developers seeking to take advantage of the law's overly generous provisions.

Reversed.

TODD, J., took no part in the consideration or decision of this case.

KELLY, Justice (dissenting)

I respectfully dissent. Our decision in *Mesaba Aviation Div. v. County of Itasca*, 258 N.W.2d 877 (Minn.1977) contemplates the application of an estoppel remedy in this case. In *Mesaba*, we articulated a balancing test in which the hardships to the individual are balanced against the potential frustration of the public interest. *Id.* at 880. In my judgment, the equities of these circumstances tip the scale in favor of plaintiff, Ridgewood Development Company, and justice requires that the state be estopped from enforcing the provisions of Minnesota Laws 1979, Chapter 306 against it.

Plaintiff's uncontroverted affidavits establish that it incurred enormous obligations in reliance on Minn.Stat. §§ 474.01 et seq. (1978). Except for the purchase of an option to buy the 180 acre tract of land, all expenditures were made in reliance on the City of Burnsville's preliminary approval of the project on November 6, 1978, the Commissioner of Security's approval on November 24, 1978, and the City of Burnsville's final approval on April 16, 1979. Defendants did not attempt to controvert the joint affidavit of the partners who formed Ridgewood Development Company. This affidavit established that the land would not have been purchased but for the availability of financing the project under the provisions of Minn.Stat. §§ 474.01 *et seq.* As a result of the city's preliminary approval of the financing of the project through the issuance of industrial revenue bonds, plaintiff incurred the obligation to pay $1,719,798.00 for the land. As of August 23, 1979, plaintiff has paid $199,655.64 on the contract for deed. Plaintiff hired the consulting firm of Urbanscope, Inc. to assist in the planning of the project which consisted of 250 single family houses, 200 quadraminiums and 400 rental units. Plaintiff

paid a $10,000 fee for Urbanscope's planning services. Plaintiff incurred a fee of $13,500 for Suburban Engineering Company's consulting work. In addition, plaintiff incurred $4,000 in legal fees and $488.88 in filing and publication fees in connection with the examination of title to the land and the preparation for the issuance of the revenue bonds. After the city's final approval of the location of streets, utilities, building units, and parklands, only ministerial acts remained to be performed before the issuance of the revenue bonds. In reliance on these actions, plaintiff entered into an arrangement for the formulation, underwriting, and issuance of the bonds with Juran and Moody, investment bankers and specialists in marketing industrial development bonds.

In short, plaintiff incurred such extensive obligations and expenses that it would be inequitable and unjust to apply the provisions of Minnesota Laws 1979, chapter 306 to it. Ridgewood Development Company's reliance expenses bear a marked similarity to the expenses incurred by the plaintiff in reliance on a county's approval of a certain site for use as a land fill in *Sullivan v. Credit River Township*, 299 Minn. 170, 217 N.W.2d 502 (1974). In that case, we held that the county was estopped from rescinding its approval of the site for use as a land fill even though the citizens were not notified of the meeting at which the approval was given. There the plaintiff expended $10,000 for engineering survey, attorney's fees and accountant's fees in addition to purchasing the land.

The majority makes much of the fact that plaintiff "has not demonstrated that there is no other way in which the land can be profitably used." Even assuming that this is an essential element of estoppel, in the context of cross motions for summary judgment, it is not plaintiff's burden to conclusively "prove" this to be the case. Plaintiff alleged in uncontroverted affidavits that proceeding with the project is a financial impossibility without the availability of financing through industrial revenue bonds.

The inducement in this case lies in the project's approval, both preliminary and final, by Burnsville and the Commissioner of Securities. But for their approval, plaintiff would not have exercised the option and incurred the other expenses listed above.

There is no evidence in the record indicating that the plaintiff's project does not benefit the public interest. In fact, the evidence indicates that the project's financing pursuant to the provisions of Minn.Stat. §§ 474.01 et seq. would benefit the public interest. In its application to the Commissioner of Securities for approval of the project, the City Council listed the factors it believed to benefit the public interest.

1. Lower interest and rental rates to users of the housing;
2. The inclusion of moderate and low priced housing will enable the City to meet the Metropolitan Council's goals for those types of housing;
3. This proposal introduces new money into the housing market;
4. Lower interest rates would allow our City to continue to grow through tight money markets;
5. The continued growth of Burnsville is necessary to utilize already constructed utilities; and
6. Reducing interest rates by 2%, which we understand is likely to result, is equivalent to reducing property taxes by one-half.

This method of financing will also assist the continual growth of Burnsville in a declining construction period, expand the tax base and assist the City in providing the adequate housing and employment required by our citizens.

There is absolutely no evidence that plaintiff's project was aimed at "erecting living accommodations for the affluent." The only evidence as regards this rather peripheral point is directly to the contrary. See City Council finding No. 2. Furthermore, there is a dearth of evidence indicating that the purpose of Minn.Stat. §§ 474.01 et seq. prior to its amendment was aimed exclusively at "providing housing for low income groups, or encouraging the construction of

multiple housing." Prior to its amendment, the chapter defined "project" broadly enough to include all housing projects provided that the powers granted the municipality be used "to aid in the redevelopment of existing areas of blight, marginal land, and substantial and persistent unemployment." Minn.Stat. § 474.01, subd. 5. As has been already pointed out, the city concluded that the project would assist "the city in providing adequate housing and employment required by our citizens."

The proper focus of inquiry is whether this project serves a public purpose, not, as the majority indicates, whether the venture is incidentally serving a private and profit-motivated end. *Cf. Port Authority of City of St. Paul v. Groppoli*, 295 Minn. 1, 202 N.W.2d 371 (1972). The majority's dictum is not only unnecessary, but also misleading. Were it construed to be a correct statement of the law, projects such as the Minneapolis City Center, financed pursuant to the provisions of Minn.Stat. §§ 472A.01 et seq. (1978) as well as factory projects financed through the issuance of municipal bonds pursuant to the provisions of Minn.Stat. §§ 474.01 *et seq.* would be unconstitutional. Such ventures are "clearly private and profit motivated." Nevertheless, they improve the tax base, provide employment and often eliminate blighted areas.

Finally, it is not the province of this court to determine whether the legislature has been "overly generous" in its legislation. Our duty is to determine only whether such legislation is reasonable and within the bounds of the Constitution.

I would therefore affirm the judgment of the district court.

SCOTT, Justice (dissenting).

I join in the dissent of Mr. Justice Kelly.

YETKA, Justice (dissenting).

I join in the dissent of Mr. Justice Kelly and would add these comments of my own in support thereof.

The majority would suggest that there was no harm to the developer and no wrongful act to invoke estoppel. Yet, here the legislature passed a law to encourage residential construction. It is a fact known to everyone that today construction money for new homes is virtually non-existent. The legislature apparently amended the law because it wanted to prevent assistance for the construction of multiple housing for the affluent, yet it specifically allowed several projects similar to this one to proceed in other communities.

One could scarcely find a more deliberate act of discrimination and denial of equal protection. Moreover, there is no evidence that this project was for the affluent alone. Even if it were, presumably the people who would buy the new units would be leaving some existing units which would then go on the market. It is the dream of most Americans to own a new home as nice as they can afford—perhaps even beyond that—by giving up other wants and desires.

Here the legislature passed a statute to encourage the activity undertaken. A developer then acquired land and expended enormous sums of money in reliance on the law only to have the rug pulled out from under it just as the bonds were to be sold and the construction begun.

I believe there are grave constitutional questions with what the legislature did here; but if the trial court were affirmed, we would not need to decide those questions.