*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2296**

Gurvin Femrite, et al.,
Appellants,

vs.

City of Lowry,
Respondent.

**Filed November 3, 2014
Reversed and remanded
Kirk, Judge**

Pope County District Court
File No. 61-CV-12-478

Stephen F. Rufer, Pemberton, Sorlie, Rufer & Kershner, PLLP, Fergus Falls, Minnesota; and Kent D. Marshall, Marshall Law Office, Barrett, Minnesota (for appellants)

Jason J. Kuboushek, Iverson Reuvers Condon, Bloomington, Minnesota (for respondent)

Considered and decided by Kirk, Presiding Judge; Hudson, Judge; and Stauber, Judge.

**U N P U B L I S H E D   O P I N I O N**

**KIRK**, Judge

On appeal from the district court's grant of summary judgment, appellants argue that the district court erred by granting summary judgment on their claims for (1) breach of contract, (2) fraud and misrepresentation, (3) equitable estoppel, (4) promissory

estoppel, (5) negligence, and (6) trespass. Because genuine issues of material fact exist, we reverse and remand.

## FACTS

In 2006, respondent City of Lowry "began exploring options for rehabilitating its existing wastewater collection and treatment systems." The city council adopted a resolution in January 2007 "that the mayor and council are authorized to execute agreements to implement this project." The city then contacted appellants Gurvin and Myra Femrite to discuss purchasing some of their farmland to build wastewater treatment ponds. The Femrites responded that they "[did] not like the idea of having the sewage ponds on [their] farmland and [felt that] it diminishe[d] the value of [their] entire farm." Nevertheless, the Femrites offered to sell 15 acres of land to the city for $257,000. Gurvin Femrite testified that the Femrites based their offer on land prices in the local newspaper.

After receiving the Femrites' offer, Mayor Bruce Larson requested an emergency city council meeting on September 21, 2007. According to members of the city council, the council decided that $257,000 was too high and authorized Mayor Larson to counteroffer $100,000 or, if necessary, $150,000. City of Lowry Clerk/Treasurer Lucy Olson testified that "[t]hat's all [Mayor Larson] was ever authorized to do by the council." In contrast, Mayor Larson testified that the council agreed to pay the Femrites' asking price if necessary. No minutes were kept of the emergency council meeting.

2

Immediately after this meeting, Mayor Larson met with the Femrites and agreed that the city would pay $257,000 for 15 acres of land.[1] Mayor Larson instructed Olson to draft an option agreement to buy the Femrites' property for $257,000. Olson objected to the price but Mayor Larson responded that "this is the only option we have" and that the other council members had already agreed to the purchase price. Olson later learned from the other council members that they had not spoken to Mayor Larson about paying the full $257,000 price. But Mayor Larson testified that the council met and agreed to pay $257,000.

Minutes from the October 2, 2007 council meeting state that the city had reached an agreement (presumably with the Femrites) "to purchase 15 acres of land to be used for new treatment ponds." Olson testified that Mayor Larson instructed the council not to discuss the purchase price at this council meeting. At a meeting in 2009, the council authorized Mayor Larson "to sign any needed documents between council meetings to allow the wastewater project to proceed as quickly as needed."

In January 2009, the city learned that the United States Department of Agriculture Rural Development Agency, which was funding the city's wastewater treatment project, thought the price was too high and requested an appraisal. The appraiser concluded that 14.5 acres of the Femrites' property was worth $3,400 per acre, for a total price of $49,300. In April 2009, Rural Development drafted the conditions of its funding for the

---

[1] Contrary to the testimony of the Femrites and other council members, Mayor Larson testified that he presented the council's counteroffers to the Femrites at this meeting. The district court determined that Mayor Larson "failed to inform [the Femrites] of the $100,000.00 offer."

wastewater system and listed the land purchase price at $49,300. Any change in cost required Rural Development approval.

On May 31, 2009, Mayor Larson wrote to the Femrites to cancel the option agreement and pay the required $10,000 in earnest money. Mayor Larson testified that the city canceled the option because it only needed 12 acres, not the 15 acres in the option agreement. According to Olson, the Femrites cashed the $10,000 check on July 9, thereby accepting the cancellation of the option to purchase. According to Gurvin Femrite, the Femrites cashed the check without realizing that it was intended to cancel the option because they thought it was the first of many payments from the city.

On July 7, 2009, the Femrites signed a warranty deed, conveying property to the city. This deed did not include the purchase price or the number of acres involved, but listed the state deed tax due as $245.19. The Femrites also signed an agreement with Mayor Larson that they would be able to "take away the good top soil to be removed" from their property during construction. Minutes from the council meeting that evening report that "the pond site property has now been purchased." Again, there was no discussion regarding the purchase price at the council meeting.

A June 2009 "Settlement Statement" listed the purchase price as $74,300 for 12.25 acres. According to the city's attorney, the $74,300 price represented the $49,300 appraisal value of the property plus the estimated attorney fees if the matter had gone through eminent domain. But the Femrites claim that they agreed to execute the warranty deed in exchange for $74,300 after Mayor Larson assured them that the city would honor its original agreement to pay $257,000. In affidavits, the Femrites stated that they only

4

conveyed their land to the city because they were told "countless times" that they would receive $257,000 and that they would not have conveyed their land for anything less than $257,000. According to Gurvin Femrite, he "assumed that [the city was] operated just like any other form of government that's on the straight and narrow" and he "took [Mayor Larson] at his word that this money [would] be coming."

In December 2010, Mayor Larson and council member Merl Farber met with the Femrites after the Femrites were told that the city did not owe them any more money. At this meeting, Mayor Larson stated that the Femrites would get the rest of their money after the project was completed.[2] Farber testified that Mayor Larson's comments surprised him because he thought the project "was over and done." The same individuals met again in November 2011, and Mayor Larson again stated that the Femrites would get the rest of their money. Farber characterized Mayor Larson's statements as a "personal agreement" with the Femrites that they would be paid the full $257,000. But Farber did not object to Mayor Larson's statements at either meeting.

On October 17, 2012, the Femrites sued the City of Lowry, alleging (1) breach of contract, (2) fraud and misrepresentation, (3) promissory and equitable estoppel, (4) negligence, and (5) trespass. Both parties moved for summary judgment. Following a hearing, the district court granted the city's motion for summary judgment. The district court concluded that, even though the parties disputed certain facts, there was no dispute as to *material* facts and the city was entitled to summary judgment. This appeal follows.

---

[2] The record does not reflect the dates of construction on the wastewater ponds.

**DECISION**

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from an award of summary judgment, this court reviews de novo whether there is a genuine issue of material fact and whether the district court erred when it applied the law. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002). "We view the evidence in the light most favorable to the party against whom summary judgment was granted." *Id.*

**I.     The district court erred by granting summary judgment on the Femrites' breach-of-contract claim.**

"A claim of breach of contract requires proof of three elements: (1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant." *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. App. 2008), *review denied* (Minn. Jan. 20, 2009). The plaintiff must also prove damages. *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 808 (Minn. App. 2007), *review denied* (Minn. Sept. 18, 2007).

Formation of a contract requires the mutual assent of the parties to the contract's "essential elements." *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 864 (Minn. 2011) (quotation omitted). "Whether mutual assent exists is tested under an objective standard." *Id.* Here, the parties agree that they

6

mutually assented to the 2007 option agreement for the city to purchase 15 acres for $257,000. "An option is merely a privilege given by the owner of property to another to buy the property at the latter's election." *M.L. Gordon Sash & Door Co. v. Mormann*, 271 N.W.2d 436, 439 (Minn. 1978). Therefore, an option "is nothing more than an irrevocable and continuing offer to sell." *Id.* (quotation omitted). When the city canceled the option agreement, there was no longer a contract between the parties.

The Femrites then conveyed property to the city without written documentation of the purchase price or the number of acres involved. A contract for the sale of land must be in writing. Minn. Stat. § 513.05 (2012). And a city contract must be in writing "with the corporate seal affixed" and executed by the mayor or clerk "pursuant to authority from the council." Minn. Stat. § 412.201 (2012). The parties appear to agree that the city purchased 12.5 acres of land, but they do not agree on the purchase price. No written contract clearly sets forth the purchase price.

The district court concluded that the parties mutually assented to a $74,300 purchase price, citing (1) the June 2009 "Settlement Statement" listing the purchase price as $74,300 and (2) the warranty deed listing the deed tax due as $245.19. Minnesota imposes a tax "on each deed or instrument by which any real property in this state is granted, assigned, transferred, or otherwise conveyed." Minn. Stat. § 287.21, subd. 1(a) (2012). When the consideration exceeds $500, "the tax is .0033 of the net consideration." *Id.*, subd. 1(b) (2012). Here, when the $245.19 in taxes on the warranty deed is divided by .0033, the result is a $74,300 purchase price. The warranty deed therefore used $74,300 as the purchase price of the property.

7

But the Femrites' breach-of-contract claim arises from their allegation that the city breached a contract to purchase 12.5 acres of land for $257,000. The Femrites argue that Mayor Larson had actual authority to assent to the $257,000 purchase price.

The city points to several pieces of evidence that suggest that Mayor Larson did not have actual authority to assent to a $257,000 purchase price. For example, in 2007, the council authorized "the mayor and council . . . to execute agreements." At the time, Bruce Larson was not yet the city's mayor. Then, at the emergency council meeting to discuss the Femrites' $257,000 offer, the council authorized Mayor Larson to present counteroffers of $100,000 and $150,000. Finally, in 2009, the council authorized Mayor Larson "to sign any needed documents between council meetings to allow the wastewater project to proceed as quickly as needed." This language does not authorize Mayor Larson to negotiate with the Femrites or to agree to a $257,000 purchase price. *See Plymouth Foam Prods., Inc. v. City of Becker, Minn.*, 120 F.3d 153, 156 (8th Cir. 1997) ("The record contains no evidence that the city council itself accepted the company's proposal or that it authorized [its employee] to accept the company's offer.").

However, when reviewing summary-judgment motions, the district court must view the evidence in the light most favorable to the nonmoving party. *See STAR Ctrs., Inc.*, 644 N.W.2d at 76-77; *see also Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn. 1981) ("All doubts and factual inferences must be resolved against the moving party."). Our review of the city's summary-judgment motion establishes that the district court improperly discredited the evidence supporting the Femrites' version of events. For example, the district court concluded that, after the cancellation of the option agreement

8

and the appraisal of the Femrites' property, Mayor Larson informed the Femrites that the city would still pay $257,000 "without council approval or knowledge," and that Mayor Larson continued to assure the Femrites without authorization after the $74,300 payment. These findings are in direct contradiction of Mayor Larson's testimony. In reaching its conclusion, the district court apparently determined that Farber's and Olson's testimonies were more credible than Mayor Larson's and the Femrites'. The district court's credibility determinations and weighing of the evidence were improper. *See Geist-Miller v. Mitchell*, 783 N.W.2d 197, 201 (Minn. App. 2010) ("[A] court deciding a summary-judgment motion must not make factual findings or credibility determinations or otherwise weigh evidence relevant to disputed facts.").

The parties introduced conflicting evidence regarding the purchase price. The 2007 option agreement listed a $257,000 purchase price for 15 acres. The February 2009 appraisal suggested that 14.5 acres was worth $49,300. The city's attorney explained that the city paid $74,300 after considering the $49,300 appraisal value and the estimated attorney fees if the matter had gone through eminent domain. But this explanation remains confusing because the $49,300 appraisal was for 14.5 acres, and the city purchased only 12.5 acres. According to Mayor Larson, the council authorized him at the emergency meeting to pay the Femrites' asking price, if necessary. In addition, Mayor Larson maintains that the council agreed in 2009 to honor the original purchase price. Viewing the evidence in the light most favorable to the Femrites, genuine issues of material fact remain regarding Mayor Larson's authority to enter and affirm a $257,000

9

contract and the city council's intent to pay $257,000, even after canceling the option contract.

Because the parties disagree regarding the purchase price—an essential element of the contract—and because there are genuine issues of material fact regarding Mayor Larson's authority to enter into and affirm a $257,000 contract, there is also a genuine issue of material fact regarding whether the parties mutually assented to a contract. *See SCI Minn. Funeral Servs., Inc.*, 795 N.W.2d at 864. Given the genuine issues of material fact, the district court erred by granting summary judgment to the city on the Femrites' breach-of-contract claim.

## II. The district court erred by granting summary judgment on the Femrites' fraud-and-misrepresentation claim.

To succeed on their fraud-and-misrepresentation claim, the Femrites must prove that (1) there was a false representation of material fact; (2) the representation was "made with knowledge of the falsity of the representation or made without knowing whether it was true or false"; (3) the representation was made with the intention to induce the Femrites to rely on it; (4) the representation caused the Femrites to act in reliance on it; and (5) the Femrites "suffered pecuniary damages as a result of the reliance." *See Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

The district court determined that the Femrites could not show that Mayor Larson's statements were made with knowledge of their falsity because Mayor Larson "truly thought he could get [the Femrites] the remaining money he felt they deserved." The district court apparently discredited Mayor Larson's testimony about the council's

10

authorization of a $257,000 purchase price, but then credited him with believing that he could get the council to pay $257,000. In doing so, the district court again failed to consider the evidence in the light most favorable to the Femrites. *See Nord*, 305 N.W.2d at 339.

Here, the evidence most favorable to the Femrites consists of the other council members' testimony that they never agreed to the $257,000 purchase price. Crediting this testimony creates a genuine issue of material fact regarding whether Mayor Larson knowingly made a false statement to the Femrites. *See Valspar Refinish, Inc.*, 764 N.W.2d at 368. In addition, the genuine issue of material fact regarding the purchase price impacts whether the Femrites suffered pecuniary damages. *See id.* Because genuine issues of material fact remain for trial, the district court erred by granting summary judgment to the city on the Femrites' fraud-and-misrepresentation claim.

Concerning this claim, the Femrites also sought rescission of the contract. Rescission is an equitable remedy allowed due to mutual mistake as to the facts of the agreement or to the absence of mutual assent. *SCI Minn. Funeral Servs., Inc.*, 795 N.W.2d at 861. "Rescission abolishes the contract and all its incidents," with the victim of the fraud "returning what he has received [and] recover[ing] all he has parted with under the contract." *Hatch v. Kulick*, 211 Minn. 309, 310, 1 N.W.2d 359, 360 (1941).

The district court determined that the Femrites were not entitled to rescission because they did not promptly request it. *See id.* at 313, 1 N.W.2d at 361 ("He who claims to have been inveigled into a contract by fraud and therefore desires to rescind must act promptly. Any unreasonable delay after discovery of the fraud ordinarily bars

rescission."). In *Hatch*, the parties disputed when the plaintiff learned of the fraud, and the supreme court remanded for the jury to determine whether the plaintiff promptly brought suit after discovering it. *Id.* Here, the Femrites likely learned that the city would not be paying the full $257,000 in late 2010, but were then told again by Mayor Larson, on at least two occasions, that they would still be paid. As in *Hatch*, a jury should consider whether the Femrites reasonably delayed in raising a rescission claim until August 2013 based on Mayor Larson's assurances. *See id.*

## III. The district court erred by granting summary judgment on the Femrites' equitable-estoppel claim.

Equitable estoppel is "intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights." *Brown v. Minn. Dep't of Pub. Welfare*, 368 N.W.2d 906, 910 (Minn. 1985) (quotation omitted). Equitable estoppel is only applied against a government entity if the equities "are sufficiently great." *Ridgewood Dev. Co. v. State*, 294 N.W.2d 288, 292 (Minn. 1980) (quotation omitted). Therefore, a plaintiff "has a heavy burden of proof" to prevail against a government entity. *Id.* In order to establish equitable estoppel against a government entity, a plaintiff must show: (1) "'wrongful conduct' on the part of an authorized government agent"; (2) the plaintiff reasonably relied on the wrongful conduct; (3) the plaintiff "incur[red] a unique expenditure in reliance on the wrongful conduct"; and (4) "the balance of the equities . . . weigh[s] in favor of estoppel." *City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 25 (Minn. 2011).

The city argues that equitable estoppel cannot apply because Mayor Larson was not "an authorized government agent." *See id.* "All persons contracting with municipal corporations are conclusively presumed to know the extent of authority possessed by the officers with whom they are dealing." *Jewell Belting Co. v. Vill. of Bertha*, 91 Minn. 9, 12, 97 N.W. 424, 425 (1903). "No representation, statement, promises, or acts of ratification by officers of a municipal corporation or a county can operate to estop it to assert the invalidity of a contract where such officers were without power to enter into such a contract [on] behalf of the corporation [or county]." *Plymouth Foam Prods., Inc.*, 120 F.3d at 157 (quotation omitted).

The Femrites argue that *Jewell Belting Co.* and *Plymouth Foam Prods., Inc.* "deal with situations where there is no evidence that the city official in question had actual authority." *See id.* at 156 ("The record contains no evidence that the city council itself accepted the company's proposal or that it authorized [its employee] to accept the company's offer."). And, as stated above, the Femrites argue that Mayor Larson had actual authority to enter into a $257,000 contract, which would make him "an authorized government agent." *See Sarpal*, 797 N.W.2d at 25. Because there is a genuine issue of material fact regarding whether Mayor Larson had actual authority, there is also a genuine issue of material fact regarding whether Mayor Larson was "an authorized government agent."

The district court concluded that the Femrites suffered no pecuniary loss because they entered a contract for $74,300 and received all that they were owed under the contract. But the genuine issues of material fact regarding the formation of the contract

13

and the purchase price also create a genuine issue of material fact regarding whether the Femrites "incur[red] a unique expenditure in reliance on the wrongful conduct." *See id.* Therefore, the district court erred by granting summary judgment to the city on the Femrites' equitable-estoppel claim.

The district court also concluded that the balance of the equities did not favor the application of equitable estoppel, *see id.*, because the Femrites entered into an "underhanded agreement[]" and "[were] not entitled to recover under an equitable remedy theory to further a scheme of deception." The Femrites argue that the equities instead favor them because the city first failed to create a written agreement and then used the absence of a written contract to change the parties' agreement. Given the genuine issues of material fact surrounding the other equitable-estoppel elements, a jury should balance the equities on remand.

## IV. The district court erred by granting summary judgment on the Femrites' promissory-estoppel claim.

"Promissory estoppel is an equitable doctrine that implies a contract in law where none exists in fact." *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000) (quotation omitted). The doctrine "requires proof that 1) a clear and definite promise was made, 2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment, and 3) the promise must be enforced to prevent injustice." *Id.* The district court declined to apply promissory estoppel because it concluded that there was a contract for $74,300.

14

The city argues that, if this court determines that a contract did not exist, the Femrites still cannot prove a promissory-estoppel claim. Specifically, the city argues that no "clear and definite promise was made." *See id.* According to the city, Mayor Larson merely promised to pay $257,000 at some point in the future once Rural Development finished its involvement in the project. But even assuming this was Mayor Larson's promise, it amounts to a definite promise to pay a specific price, and it differs from the city's examples of vague assurances. *See Ruud v. Great Plains Supply, Inc.*, 526 N.W.2d 369, 370-72 (Minn. 1995) (explaining that "[g]ood employees are taken care of" and "[y]ou are considered a good employee" were "not 'clear and definite' enough to support a claim for promissory estoppel"); *see also Ott v. Target Corp.*, 153 F. Supp. 2d 1055, 1077 (D. Minn. 2001) (stating that a promise to "aggressively promote and advertise" a product was not "clear and definite" enough for promissory estoppel). Even though Mayor Larson did not promise payment by a certain date, he made a definite promise regarding price and timing that could amount to a "clear and definite promise." *See Martens*, 616 N.W.2d at 746.

The city also argues that the Femrites cannot show injustice, *see id.*, because the Femrites did not reasonably rely on Mayor Larson's promise and the Femrites received $35,000 more than the appraisal value of the property. The reasonableness of the Femrites' reliance is one factor to consider when determining whether a promise must be enforced to prevent injustice. *See Faimon v. Winona State Univ.*, 540 N.W.2d 879, 883 n.2 (Minn. App. 1995), *review denied* (Minn. Feb. 9, 1996). But the justice of the Femrites' reliance and compensation are again tied to the genuine issues of material fact

regarding the formation of the contract and the contract price. The district court erred by granting summary judgment to the city on the Femrites' promissory-estoppel claim.

**V.  The district court erred by granting summary judgment on the Femrites' negligence claim.**

"Negligence is generally defined as the failure to exercise such care as persons of ordinary prudence usually exercise under such circumstances." *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011) (quotation omitted).

> A defendant in a negligence suit is entitled to summary judgment when the record reflects a complete lack of proof on any of the four essential elements of the negligence claim: (1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) the breach of the duty being the proximate cause of the injury.

*Funchess v. Cecil Newman Corp.*, 632 N.W.2d 666, 672 (Minn. 2001).

According to their agreement, the Femrites removed the good top soil from the land purchased by the city and the city stored additional construction material and clay on the Femrites' property near the construction site. After construction, the remaining clay was leveled off on four acres of the Femrites' property, and topsoil was placed on top of the clay. In their complaint, the Femrites alleged that the city "damaged [their] surrounding land, causing past, present, and continuing crop loss, and a reduction in the value of the land."

The city argues that, during his deposition, Gurvin Femrite testified that the negligence claim was based solely on the placement of the wastewater ponds. In response, the Femrites argue that they explained in affidavits and answers to interrogatories that the negligence claim was based on damage to the land around the

wastewater ponds. The language in the Femrites' complaint appears to suggest a broader negligence claim. But the parties' disagreement demonstrates a genuine issue of material fact for which summary judgment was inappropriate. The breadth of the negligence claim impacts the city's duty of care and the Femrites' argument that the city failed to exercise "such care as persons of ordinary prudence usually exercise under such circumstances." *See Domagala*, 805 N.W.2d at 22 (quotation omitted). The district court did not fully explain why it concluded that the Femrites failed to allege a breach of duty, and erred by granting summary judgment to the city on the Femrites' negligence claim.

The city argues that it was properly granted summary judgment on the Femrites' negligence claim due to vicarious official immunity. The city raised this argument below, but the district court did not address this alternative argument. As a result, we decline to consider the city's vicarious-official-immunity argument on appeal. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) ("A reviewing court must generally consider only those issues that the record shows were presented and considered by the [district] court in deciding the matter before it." (quotation omitted)).[3]

## VI.   The district court erred by granting summary judgment on the Femrites' trespass claim.

"Under Minnesota trespass law, entry upon the land that interferes with the landowner's right to exclusive possession results in trespass whether that interference was reasonably foreseeable or whether it caused damages." *Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 703 (Minn. 2012).

---

[3] The city also raises this argument in regard to the Femrites' trespass claim, and we similarly decline to address it. *See Thiele*, 425 N.W.2d at 582.

> Trespass is not committed if there is permission or consent to do the acts complained of. . . . The general rule is that permission to do a particular act carries with it authority and the right by implication to do all that is necessary to effect the principal object and to avail the licensee of his rights under the license.

*Meixner v. Buecksler*, 216 Minn. 586, 590, 13 N.W.2d 754, 756 (1944).

The parties contracted for the construction of the wastewater ponds and the removal of the top soil. As a result, the Femrites consented to allow the city to enter and disturb the land. The Femrites also consented to allow the city to do everything necessary to construct the wastewater ponds, including removing clay and storing it nearby. But the Femrites did not consent to a reduction in the value of their land. Because the Femrites have raised a genuine issue of material fact regarding whether the city's actions interfered with their exclusive possession, the district court erred by granting summary judgment to the city on the Femrites' trespass claim.

**Reversed and remanded.**