Dr. Hector BROWN, Relator,

v.

**MINNESOTA DEPARTMENT OF
PUBLIC WELFARE,**
Respondent.

No. C9–84–295.

Supreme Court of Minnesota.

June 7, 1985.

Richard C. Hiniker, White Bear Lake, for relator.

Hubert H. Humphrey, Atty. Gen., Erica Jacobson, Asst. Atty. Gen., St. Paul, for respondent.

P. Kenneth Kohnstamm, Asst. Atty. Gen., St. Paul, amicus curiae.

## OPINION

AMDAHL, Chief Justice.

On February 17, 1982, the Department of Public Welfare (Department) informed Dr. Hector Brown that he had been erroneously paid $14,673.11 on claims he submitted under the Minnesota Medical Assistance Program. The letter demanded repayment of the money and informed Dr. Brown of his right to demand a contested case hearing on the matter. Dr. Brown requested a contested case hearing. On January 7, 1983, the hearing examiner issued his report, recommending that Dr. Brown be required to repay the Department. The Commissioner adopted the findings of the hearing examiner and ordered Dr. Brown to repay the Department on January 12, 1984. Dr. Brown appealed to the Court of Appeals from the order of the Commissioner. The Court of Appeals reversed, ruling that the Department was estopped from demanding repayment for claims erroneously paid, 354 N.W.2d 115 (Minn.App.1984). The Department petitioned this court for review. We reverse.

On February 17, 1982, the Department of Public Welfare demanded reimbursement from Dr. Brown for $14,673.11 erroneously paid on claims submitted between January 1, 1981, and February of 1982. The claims had been paid for services to welfare recipients with a primary diagnosis of obesity. Under the medical assistance regulations, weight reduction services are not covered unless the physician has received prior authorization to perform them. A computer audit of several hundred claims submitted by Dr. Brown revealed that he had not received prior authorization.

Dr. Brown's claims were audited during a federally-mandated percentage review of doctors who receive payment from the Department. A Department investigator was assigned Dr. Brown's file on February 10, 1982. The audit involved scrutinizing claims for exceptional items. The investigator requested a computer printout of claims made by Dr. Brown where he had sought reimbursement for treating obesity. He received a 100-page printout listing such claims submitted after January 1, 1981. When he determined that Dr. Brown had not received prior authorization for these claims, the investigator wrote Dr. Brown the letter demanding reimbursement.

Dr. Brown practices medicine in St. Paul and, until he took on an associate in January of 1982, was a solo practitioner. He describes his practice as 60% weight reduction treatment and 40% general medicine. Approximately 25% of his patients are on medical assistance. His routine procedure for treating obesity consists of an initial examination to assess the patient's condition, development of a diet plan, the prescription of weight reduction medication, and monthly followup visits. Dr. Brown has been a medical assistance provider

since 1950. He testified that he knows little about the process of obtaining reimbursement from the Medical Assistance Program and could not fill out the forms himself. This work is done for him by an office assistant. The office assistant reads from a patient's chart, filled out by Dr. Brown, and then records the services rendered on an invoice and sends it to the Department. Dr. Brown had never seen or heard of the Department's Physician's Handbook until it was shown to him at the hearing.

The Department's Physician's Handbook describes covered services and procedures for obtaining payment under the Medical Assistance Program. Dr. Brown's office manager, Sheila Trumble, recalled receiving the Handbook in February or March of 1981. She noticed that weight reduction services were listed in the Handbook as requiring prior authorization. Trumble called the Department and was referred to Thomas Jolicoeur, supervisor of the Department's Professional Services Section. She testified that she asked how to obtain prior authorization and he told her what steps to take. He told her that a form requesting authorization would have to be completed, and that authorization would not be guaranteed. Trumble said they discussed weight control services not under a doctor's supervision, and that Jolicoeur mentioned that Weight Watchers programs are not covered because they are not under a doctor's supervision. Trumble was left with the "impression" after the conversation that as long as weight reduction programs were physician-supervised, they were covered. She, therefore, did not follow the steps Jolicoeur set out for obtaining prior authorization.

Jolicoeur did not recall having had a telephone conversation with anyone from Dr. Brown's staff in early 1981. Jolicoeur is responsible for the processing of prior authorization requests. The requests are referred for approval or disapproval to consulting physicians. Jolicoeur said that he usually receives two calls each day on procedures for obtaining prior authorization.

The parties stipulated that Dr. Brown submitted invoices indicating a primary diagnosis of obesity as listed on the Department's computer printout. The services provided were aimed specifically at weight reduction. Dr. Brown was reimbursed $14,673.11 for these services. Dr. Brown did not submit a request for prior authorization for these services and did not receive written prior authorization from the Department to provide them. The invoices did not indicate that prior authorization had been obtained and the Department did not reject any of the invoices submitted from January 1, 1981, to February 14, 1982. Since discovering the problem, the Commissioner has withheld from Dr. Brown payments totalling $1,048.37. The Commissioner still demands that Dr. Brown repay $13,624.74. The parties further stipulated that, as a provider, Dr. Brown agreed to abide by the statutes and regulations governing the Medical Assistance Program. The stipulation also provided that the Department "has the computer capability of instituting a mechanism to reject all claims for weight reduction services rendered without prior authorization."

1. Minn.Stat. § 256B.064, subd. 1a (1984), authorizes the Commissioner of Public Welfare to seek "monetary recovery and impose sanctions" against vendors of medical care for "fraud, theft, or abuse in connection with the provision of medical care to recipients of public assistance." The Department is authorized to make rules to carry out and enforce the provisions of the statute and to establish criteria and procedures for the identification and investigation of suspected medical assistance fraud, theft, and abuse. Minn.Stat. § 256B.04, subds. 2, 10 (1984). Department regulations define abuse as—

a pattern of practice by a provider * * * which is inconsistent with sound fiscal, business, or medical practices, and results in unnecessary costs to the programs, or in reimbursements for services that are not medically necessary or that fail to meet professionally recognized standards for health care. Abuse is

characterized by, but not limited to, the presence of one of the following conditions:

\* \* \* \* \* \*

The repeated submission of claims by a provider for health care which is not reimbursable under the programs \* \* \*.

1983 Minn.Rules 9505.1750, subp. 2.

■ Dr. Brown submitted over 900 claims for reimbursement for weight reduction services rendered to medical assistance recipients between January 1, 1981, and February 1982. He did not obtain prior authorization to provide these services. Department rules provide that—

  (A) The following physician services must receive prior authorization:

  (1) All medical, surgical, or behavioral modification services aimed specifically at weight reduction;

1983 Minn.Rules 9500.1070, subp. 4(A)(1). Because he did not receive prior authorization to perform weight reduction services, Dr. Brown was repeatedly submitting claims not reimbursable under the Medical Assistance Program. That behavior constituted "abuse" under the Department's regulations.

2. Dr. Brown claims the statute requires that abuse be determined by the Commissioner in consultation with a review committee prior to the filing of a petition to recover erroneously paid funds. Minn.Stat. § 256B.064, subd. 1a (1982), provided, in part, that:

> The determination of abuse or services not medically necessary shall be made by the commissioner in consultation with a review organization as defined in section 145.61 or other provider advisory committees as appointed by the commissioner on the recommendation of appropriate professional organizations.

The statute was amended in 1983 to delete the requirement of consultation with a review committee on matters of abuse. Act of June 9, 1983, ch. 312, art. 9 § 17, 1983 Minn.Laws 1778, 1830. The Department concedes, however, that the prior version of the statute applies to this case.

The Department of Public Welfare Medical Advisory Committee reviewed this case on March 3, 1983, after the hearing examiner filed his report. The committee unanimously found that Dr. Brown's failure to obtain prior authorization for weight reduction services constituted "abuse." The Commissioner issued his order requiring reimbursement on January 12, 1984. Dr. Brown contends that the statute requires the committee's determination of abuse to precede the initiation of a contested case hearing, that the Department failed to do this, and that the Department can therefore not collect the money it claims.

■ Both the hearing examiner and the Commissioner found that consultation with the review committee need not occur before recovery is sought. As the Department points out, there is no timing requirement set out in the statute. Requiring the Commissioner to consult with the review committee before any proceedings are commenced, as Dr. Brown urges, would force the committee to determine whether abuse occurred before the complete facts are known. The obvious intent of the review requirement, however, was to have a committee assist the *Commissioner* in determining program abuse, a determination he does not make until the hearing examiner's report is complete. Consultation with the review committee at that time thus satisfied the statutory requirement.

3. Dr. Brown also contends that the Department may not recover funds already paid, but is limited to debiting future payments to recover the sums erroneously paid him. Minn.Stat. § 256B.064, subd. 1c (1984), provides that:

> The commissioner may obtain monetary recovery for the conduct described in subdivision 1a [abuse] by the following methods: assessing and recovering moneys erroneously paid and debiting from future payments any moneys erroneously paid \* \* \*.

The Department's regulations are replete with authorization to recover erroneously paid funds. *See* 1983 Minn.Rules 9500.-

0960 ("Failure by the provider to comply with federal and state statutes, rules and regulations pertinent to the MA program shall result in termination of the provider agreement, ineligibility to receive MA program reimbursement and, where appropriate, action to recover medical assistance funds."); 1983 Minn.Rules 9500.1080, subp. 3 ("The state agency is authorized to recover any medical assistance funds paid to providers when it determines that such payment was obtained fraudulently or erroneously. Such recovery may be accomplished through withholding current obligations due the provider or by demanding that the provider refund amounts so received. Recovery * * * is permitted for intentional as well as unintentional error on the part of the provider or state or local welfare agency; [and] for failure to comply fully with * * * prior authorization procedures * * *."); 1983 Minn.Rules 9505.1920 ("The commissioner may seek monetary recovery against providers for * * * abuse in connection with health care services billed to the programs * * *.").

■ Both the statute and the regulations authorize recovery of money the Department has paid. It should be noted that Dr. Brown quit as a provider of medical assistance in the spring of 1982. Limiting the Department's ability to recover funds to debiting future payments would preclude recovery of any funds from Dr. Brown. Dr. Brown's interpretation of the statute and regulations would enable any provider who commits fraud or abuse in submitting claims to insulate himself from recovery by terminating his provider status. The statute and regulations clearly permit the Department to recover monies erroneously paid.

4. Dr. Brown contends that the Department should be estopped from recovering the funds it erroneously paid him. He bases his claim of estoppel on the telephone conversation his employee had with the Department's employee, Thomas Jolicoeur, and the fact that the Department reimbursed him for over 900 claims before it discovered that he lacked prior authorization to perform the weight reduction services.

■ This court has described estoppel as—

an equitable doctrine addressed to the discretion of the court and * * * intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights. To establish a claim of estoppel, plaintiff must prove that defendant made representations or inducements, upon which plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed.

*Northern Petrochemical Co. v. United States Fire Insurance Co.*, 277 N.W.2d 408, 410 (Minn.1979). The government may be estopped if justice requires, but this court has said that it does not "envision that estoppel will be freely applied against the government." *Mesaba Aviation v. County of Itasca*, 258 N.W.2d 877, 880 (Minn.1977). To estop a government agency, some element of fault or wrongful conduct must be shown. *Ridgewood Development Co. v. State*, 294 N.W.2d 288, 292–93 (Minn.1980). A plaintiff seeking to estop a government agency has a heavy burden of proof. *Id.* at 292. When deciding whether estoppel will be applied against the government, the court will weigh the public interest frustrated by the estoppel against the equities of the case. *Mesaba* at 880.

The Court of Appeals, the Department, and the hearing examiner agreed that Sheila Trumble's telephone conversation with Thomas Jolicoeur did not estop the Department from recovering the funds paid to Dr. Brown. The hearing examiner accepted Trumble's testimony that after the telephone conversation, she was left with the impression that Dr. Brown did not have to comply with the prior authorization requirement. The hearing examiner also found, however, that Jolicoeur did *not* tell Trumble that prior authorization was not required. Jolicoeur testified that while he did not recall any telephone conversation with Trumble, he would not have told her

that prior authorization was not required. Since Trumble could not attribute to Jolicoeur a direct statement that prior authorization was not required, the hearing examiner found no grounds for estoppel.

The Court of Appeals agreed with the hearing examiner based upon the factual finding that Jolicoeur did not specifically state that prior authorization was not required. The factual finding of the hearing examiner is amply supported by the record. The hearing examiner essentially accepted the testimony of both Jolicoeur and Trumble. Trumble testified only that she was left with an "impression" that prior authorization was not required, making no claim that Jolicoeur specifically represented this. Jolicoeur said that he would not have told her that prior authorization was not required. The record therefore does not disclose a representation by the Department upon which an estoppel could be based. The record also would not support a finding of reasonable reliance, since Trumble chose to act upon an "impression" opposed to the clear language of both the Physician's Handbook and Department regulations.

Dr. Brown also claims that the government is estopped by its conduct from collecting the funds erroneously paid him because it processed and paid over 900 claims before it discovered the error. The claims did not indicate that prior authorization had been received, but the government nevertheless continued to reimburse Dr. Brown for rendering weight reduction services over a 13-month period of time. Dr. Brown contends that this conduct constituted an inducement upon which he reasonably relied in continuing to submit claims without prior authorization.

The hearing examiner noted that nothing in the record suggests that authorization would not have been granted had it been requested. Jolicoeur testified that approximately 70% to 80% of weight reduction requests are granted by the Department. The hearing examiner thus concluded:

It would appear that a windfall would result to the Medical Assistance Program, and DPW, if no reimbursement were permitted for any of the over 900 claims submitted.

* * * In this matter, [however], DPW took no affirmative action upon which the Petitioner relied to its detriment. Rather, the Department erroneously paid claims for services which required prior authorization. In balancing the equities in this case, the Hearing Examiner concludes that the policy reasons for prior authorization, and recovery for the "unauthorized" claims paid herein, outweigh the detriment to Petitioner of repayment. Petitioner's failure to follow the correct prior authorization procedures herein was its own fault and cannot be foisted upon DPW.

The Court of Appeals, however, reversed the Department and found that the Department's payment of the first few faulty claims, and continuing payment of claims thereafter, constituted the inducement necessary for estoppel. The Court of Appeals also found that Dr. Brown's reliance on the inducement was reasonable after he received payment. The court noted that Dr. Brown would be unable to recover his fees from the medical assistance recipients if forced to repay the Department. Finally, in balancing the equities favoring estoppel against the public interest potentially frustrated by the estoppel, the court found that while application of estoppel would diminish the effect of the Department's prior authorization rule, not estopping the Department would work substantial hardship upon a physician. Noting that the participation of physicians is essential to the program goal of providing medical care to the needy, the court estopped the Department from recovering the funds it paid Dr. Brown.

■ We disagree with the Court of Appeals and find that the elements necessary for estoppel were not present in this case. First, the payment of claims by the Department was not sufficient to induce Dr. Brown to believe that no prior authorization was required. In *Ridgewood Development Co. v. State*, 294 N.W.2d 288 (Minn.

1980), this court rejected a claim that the government was estopped from applying an amendment of the Municipal Industrial Development Act to a development undertaken by the appellant. Appellant purchased land and began promotional activity after the state had approved its request for municipal bond financing. The legislature then amended the statute to exclude from eligibility the type of project contemplated by appellant. In rejecting appellant's claim of estoppel, the court noted that to estop the government, some fault or wrongful conduct on the part of the government agency is required to find the element of inducement. Because amending the statute was not wrongful conduct, the court refused to estop the government. *Id.* at 292–93.

In this case, the Department did not engage in any wrongful conduct. Its computer processed Dr. Brown's claims and paid them. Department regulations, and the Physician's Handbook which Dr. Brown's employees read, clearly required prior authorization for weight reduction services. The fact that the computer screening process did not catch Dr. Brown's error did not amount to the wrongful conduct required for estoppel against the government. *Compare Mesaba Aviation v. County of Itasca,* 258 N.W.2d 877 (Minn.1977) (written representation by government that property would not be subject to taxation did not estop government from collecting tax on the property). Furthermore, the regulations clearly provide for the recovery of erroneous payments, thus informing medical providers that by paying a claim, the government is not representing that there are no defects in the claim which would require recovery of the funds paid.

Dr. Brown also did not demonstrate that his reliance on the payments was reasonable. Dr. Brown's staff knew from the Physician's Handbook that prior authorization is required for weight reduction services. There was no specific representation to them that prior authorization was not required. Dr. Brown did not familiarize himself with either the Handbook or the regulations. As the United States Supreme

Court has said, in refusing to estop the federal government from recovering erroneous Medicaid payments from a provider:

> [T]hose who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law.
>
> As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement.

*Heckler v. Community Health Services of Crawford County, Inc.,* —— U.S. ——, 104 S.Ct. 2218, 2226, 81 L.Ed.2d 42 (1984). *Heckler* involved a specific oral representation that a provider was in compliance with the regulations, but government payments were later found erroneous. The court found no reasonable reliance because the representation was oral, respondent had a duty to know the law, and the respondent got its advice from a "fiscal intermediary," rather than the government agency itself. The Court apparently assumed that the fact the government erroneously paid respondent $71,480 from 1975 to 1977 was itself no basis for estoppel.

Finally, it appears that the Court of Appeals did not fully appreciate the potential damage to the public interest by estopping the Department solely because it paid Dr. Brown's claims. The Court of Appeals' decision would estop the Department from recovering erroneously paid claims any time it processed and paid more than a handful of them to any single provider. Such a rule would both force the Department to spend more time screening claims before payment and prevent the Department from recovering erroneous payments once made. Federal law requires that 90% of claims submitted be paid within 30 days of their receipt and provides monetary incentives for states which recover sufficient amounts of erroneously paid money. 42 U.S.C. § 1396(a)(37), 1396(b)(s)(2)(c) (1983). The Court of Appeals' decision thus would jeopardize Minnesota's ability to comply with the federal requirements for medical assistance.

On balance, the equities in favor of Dr. Brown are outweighed by the public interest that would be frustrated by estopping the government in this situation. Dr. Brown also has not proven the inducement and reliance elements necessary for estoppel.

Reversed.