In the Matter of the Contested Case of
**RESIDENTIAL ALTERNATIVES,
INC., Relator,**

v.

**MINNESOTA DEPARTMENT OF
HUMAN SERVICES,**
Respondent.

No. C9–85–2204.

Court of Appeals of Minnesota.

May 27, 1986.

Review Denied July 31, 1986.

Gerald S. Duffy, Jeffrey G. Stephenson, Peterson, Tews & Squires, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., Gary A. Van Cleve, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPO-VICH, C.J., and LANSING and HUSPENI, JJ.

## OPINION

LANSING, Judge.

Residential Alternatives, Inc., which operates ten intermediate care facilities for the mentally retarded, appeals from an order of the Commissioner of the Department of Human Services affirming the department's method of calculating known cost change paybacks for a period in 1983 when the legislature reduced payments to medical assistance providers by four percent and disallowing depreciation on life safety equipment installed to satisfy certification requirements. Residential Alternatives contends that the Commissioner exceeded his statutory authority and that his decision was both unsupported by substantial evidence and arbitrary and capricious. We affirm.

## FACTS

Medical assistance pays for the care of all residents in Residential Alternatives' homes. Per diem rates are determined by the formula set out in Minn.R. 9510.0500 *et seq.* (1983). Under this rule, a facility's projected known cost changes are factored into the rate-setting formula. *See* Minn.R. 9510.0520. At the end of each facility's rate year, the year's actual costs are compared with the projected known cost changes, and any adjustment necessary is made to the per diem rate. *See* Minn.R. 9510.0520, subp. 3; 9510.0550. If the rate paid based on projected known cost changes exceeds actual costs, DHS requires the facility to pay back the difference. Per diem rates paid for the rate years which began during the biennium ending June 30, 1983 (July 1, 1981–June 30,

1983), could not "exceed by more than ten percent the final rate allowed to the facility for the preceding rate year." Minn.Stat. § 256B.03, subd. 2 (1982); *see also* § 256B.501, subd. 3 (1984) (for rate years beginning during the fiscal biennium ending June 30, 1985, rates may increase no more than five percent from year to year).

In December 1982, in reaction to revenue shortfalls, the legislature enacted a bill to reduce state expenditures and raise state revenues. The bill reduced the general fund appropriation for medical assistance by $5.2 million and further provided:

> Notwithstanding any other law to the contrary, payments to all medical assistance vendors shall be reduced by four percent for the period January 1, 1983 to June 30, 1983. For long-term care providers, this reduction shall apply to payment rates in effect on January 1, 1983 and shall also be applied to any rate established after that date for payment for the period January 1 to June 30, 1983. All payments to vendors shall be uniformly affected regardless of the timing of any rate years. This reduction in payments shall not be subject to the rule-making provisions of the Administrative Procedure Act.

1983 Minn.Laws, 1982 3rd Spec.Sess., ch. 1, art. 2, § 2, subd. 4.

On December 27, 1982, DHS published the following notice in the State Register:

> LIMIT ON PAYMENT TO LONG TERM CARE FACILITIES
>
> Payments to all long term care providers * * * will be reduced by four percent for the period from January 1 through June 30, 1983.
>
>    *    *    *    *    *    *
>
> This payment reduction will be first reflected in the warrant issued during February, 1983 * * *.

7 S.R. 1001 (Dec. 27, 1982). A similar statement was made in a department bulletin dated January 1, 1983, sent to medical assistance providers.

At a regularly scheduled January 1983 meeting between intermediate care providers and DHS staff, providers raised questions about the implementation of the four percent reduction. DHS staff explained the method they would use to reduce payments, and said they had not yet decided how to calculate known cost change paybacks for that period. There is no question but that the method DHS ultimately used to implement the four percent reduction was consistent with statements made in the bulletins and at the January meeting.[1]

The method DHS adopted for determining known cost change paybacks was set out in Long-Term Care Bulletin No. 31 and sent to providers in March 1983. Under this method, an adjusted per diem rate was established based on the facility's actual spending for the entire year, as provided in Minn.R. 9510.0520. The adjusted rate was compared to the rates actually paid during the six-month period when the four percent reduction was in effect and the six-month period when it was not in effect. If the actual rate paid exceeded the adjusted per diem rate in either period, a payback would be requested. This method differed from past practice only in that the rate year was divided into two six-month periods.

After reviewing cost reports for the relevant period, DHS, using the method described above, determined that no paybacks would be required for any of the Residential Alternatives facilities for the six-month period from January 1, 1983 to June 30, 1983. For the six-month period from July 1, 1983 to December 31, 1983, DHS required per diem paybacks ranging from 15 cents for Residential Alternatives VIII to $2.96 for Residential Alternatives VII.

---

1. DHS calculated the payments by the following method: (payable days) × (per diem rate) × (.96) = total amount paid. The result under this formula is the same whether days are reduced by four percent, rates are reduced by four percent, or the product of (days × rates) is reduced by four percent.

The total payback required from all Residential Alternatives' facilities is $12,775. DHS also disallowed depreciation on certain equipment because the cost was part of the facility's initial investment.

Residential Alternatives challenged the requested paybacks, and a contested case hearing was held. The administrative law judge found that the department's failure to net the paybacks for the two six-month periods violated rules requiring "annualization" of costs and was arbitrary and capricious because the method used provided an unfair and incomplete picture of spending for one year. He also found the method had the effect of reducing rates in the long term, a result not intended by the legislature. The administrative law judge further found that the facilities relied on representations that the effects of the four percent reduction would be short-term and concluded that DHS should be estopped from acting "in a fashion that is inconsistent with its earlier representations."

The administrative law judge recommended that paybacks be computed by the netting method, but recommended affirming the department's disallowance of depreciation for modifications. The Commissioner rejected the administrative law judge's findings, conclusions and recommendations regarding paybacks. Specifically, the Commissioner concluded that DHS's method of calculating the paybacks was consistent with the legislation; the method adopted was within its discretion; the netting method proposed by the providers would completely negate the four percent reduction mandated by the legislature; the providers were never told that netting would be permitted; and there is insufficient evidence to support a finding that DHS should be estopped from implementing the method it selected for assessing paybacks.

The Commissioner therefore affirmed the department's method for calculating known cost change paybacks and its disallowance of depreciation on equipment that was part of Residential Alternatives VI's initial investment.

## ISSUES

1. Did the Commissioner err by rejecting the administrative law judge's findings?

2. Is DHS's method of calculating known cost change paybacks consistent with its statutory authority, supported by substantial evidence, or arbitrary and capricious?

3. Should DHS be estopped from implementing the method it adopted for assessing paybacks?

4. Did DHS correctly disallow depreciation on equipment that was part of Residential Alternatives IV's initial investment?

## ANALYSIS

### I

Residential Alternatives initially contends that the Commissioner erred by rejecting the administrative law judge's findings because only the administrative law judge may draw inferences from conflicting or contradictory evidence. This contention misstates the relationship between the administrative law judge and the agency. In general, an administrative law judge

> presides at meetings and makes recommendations for decision. But the agency is not bound by the findings and recommendations of the [administrative law judge]. K. Davis, *Administrative Law Text*, § 10.07 (3rd ed. 1972). In this sense, the relationship differs from that of an appellate court reviewing a lower court's findings of fact: an agency could make new findings and decide contrary to the [administrative law judge's] recommendation. *Id.* at § 10.04.

*Hymanson v. City of St. Paul*, 329 N.W.2d 324, 326–27 (Minn.1983). *See also* Minn.R. 9510.0580, subp. 4 ("Because existing state law does not permit the commissioner to delegate his powers, final authority on disposition of disputes must be retained by the commissioner.").

Residential Alternatives' reliance on *State, Gomez-Bethke v. Office of County Auditor, Douglas County,* 347 N.W.2d 541 (Minn.Ct.App.1984), is misplaced. In cases brought under the Human Rights Act, the administrative law judge's order constitutes the final decision of the Department of Human Rights. *See* Minn.Stat. § 363.071, subd. 2 (1984). In this case the final decision is made by the Commissioner, not the administrative law judge.

## II

The department's formula for calculating paybacks involves two basic steps. First, the projected costs are compared with actual costs for the entire year. The amount by which the projected costs exceed actual costs is the amount of the payback. That sum is divided by total resident days to arrive at a known cost change payback. The known cost change payback is subtracted from the facility's requested rate to obtain the adjusted per diem rate, which carries over to the next year.

Second, the department compares the adjusted per diem rate to the rate actually paid. As a function of the reduced payments from January 1 to June 30, 1983, the actual rate paid was reduced for that period.[2] Because of the differing rates of payment for the two periods, the department compared the adjusted rate with the actual rate for each six-month period to determine the amount of the per diem payback.[3]

### Long-Term Effect

Residential Alternatives contends that in enacting the four percent reduction the legislature intended only short-term consequences, and the department is therefore precluded from adopting a method of calculating paybacks that has any long-term effect. We disagree for two reasons.

■ First, although both the Commissioner and Residential Alternatives argue that the language of the statute supports their respective positions on the validity of the payback formula, the statute addresses only the initial four percent reduction in payments. It does not address how that reduction is to affect the department's calculation of known cost change paybacks. *See* 1983 Minn.Laws, 1982 3rd Spec.Sess., ch. 1, art. 2, § 2, subd. 4. The calculation of known cost change paybacks is governed by Minn.R. 9510.0520, not by the legislation creating the four percent reduction.

■ Second, any change in a rate will have a long-term effect when legislative rate caps are in place. If we accepted the preclusion argument, the department would not be able to adjust rates based on the facilities' actual costs, as directed by statute and rule. *See* Minn.Stat. § 256B.501, subd. 2; Minn.R. 9510.0520, subp. 3. The department did not exceed its statutory authority by using a method of calculating paybacks that has a long-term effect because it incorporates historical cost principles.

### Netting

■ Residential Alternatives claims Minn.R. 9510.0520 requires "annualization"

---

**2.** *See infra* n. 1.

**3.** This example is based on figures for Residential Alternatives I:

(1) Payback (amount by which projected costs exceeded actual costs): $6,817

Payback (6817)/Resident days (2175) = $3.13

| | |
|---|---|
| Rate requested: | $63.24 |
| Known cost change payback: | $ 3.13 |
| Adjusted per diem rate: | $60.11 |

(2) Rate paid 1–1–83 through 6–30–83 ($61.02 × 96%): $58.58
Adjusted per diem rate: $60.11
Known cost change payback for period: ($1.53)
(no payback)
Rate paid 12–1–82 to 12–31–82 and 7–1–83 to 11–30–83: $61.02
Adjusted per diem rate: $60.11
Known cost change payback for period: $ .91
payback

of costs and the department's failure to net the two payback periods violates the rule. With regard to paybacks, the rule provides:

> If the sum of known cost changes * * * do not in fact occur, the welfare rate will similarly be subject to adjustment * * *. If the sum of actual cost increases exceed the known cost changes * * *, no adjustment in welfare rate will be made.

*Id.,* subp. 3.

> The Commissioner's memorandum says: [P]laintiffs are correct that annualization is required under the rule for purposes of calculating the original rate and adding in the known cost changes; but there is no requirement in the rule that paybacks be annualized. Moreover what plaintiff is really arguing for is a "netting" of the payback, not an annualizing.

We agree with the Commissioner. The rule permits the department the discretion to determine the precise method by which the adjustment is to be made. The method used by the department does not violate the rule.

■ Next, Residential Alternatives argues that the department consistently "annualized" paybacks in the past, that this practice constitutes an interpretive rule, and that in this case DHS has departed from past practice without explaining its actions. This departure, it claims, amounts to a denial of due process.

The Commissioner noted that only limited weight could be given to the department's "past practice" because DHS had never before dealt with "emergency" legislation that, while reducing payments during one six-month period, created different rates of payment within a single rate year. The Commissioner's memorandum says that "to the extent that there was any relevant past practice * * *, the methodology chosen by DHS in this case was consistent with such practice." The record shows that the agency has always adjusted rates based on actual costs, and that a similar method was used in a case in which

a nursing home had different private pay rates within a single rate year. The department's division of the rate year into two periods is consistent with the rule and with its past practice and is therefore a permissible interpretation of the rule. *See Cable Communications Board v. NorWest Cable Communications Partnership,* 356 N.W.2d 658, 667 (Minn.1984). The facilities were not denied due process.

■ Finally, Residential Alternatives claims the method chosen is arbitrary and capricious because it unfairly portrays spending over the course of the year. The adjusted per diem rate takes into account actual expenses over an entire year; the year was separated into two periods only for purposes of determining the paybacks for those periods. Under the circumstances, the department's division of the rate year into two periods based on the actual rates paid is not arbitrary or capricious.

## III

Residential Alternatives contends that DHS should be estopped from using its method of calculating paybacks because of representations made by the deputy commissioner at the January 1983 meeting. Departmental representatives specifically said that DHS had not determined how it would calculate paybacks in light of the legislation. No one ever stated that netting would be permitted. According to testimony, the deputy commissioner made statements to the effect that there would be no long-term effects and that providers would not have to spend funds they did not receive.

Residential Alternatives argues that it relied on those statements by cutting costs during the period of the reduction instead of borrowing to meet its projected cost changes, and that the only way to avoid a payback under the department's formula is to have spent funds not received. In effect, appellant argues that because it intentionally underspent during the reduction

period, allegedly in reliance on DHS's statements, the department may not adjust the per diem rate to reflect actual costs but must carry forward the actual rate paid as if Residential Alternatives had spent at that level. As we noted above, this argument is inconsistent with the statutory directive that rates be related to actual costs. It also inaccurately assumes that the "costs" reflected in the department's formula represent money actually spent during the six-month period; in fact, the "costs" include depreciation and an earnings allowance, which are not actual expenses.[4]

A government agency may be estopped if justice requires. *Mesaba Aviation Division of Halvorson of Duluth, Inc. v. County of Itasca,* 258 N.W.2d 877, 880 (Minn.1977). However, estoppel will not be "freely applied against the government". *Id.* A party seeking to estop a governmental agency carries a heavy burden of proof. *Brown v. Minnesota Department of Public Welfare,* 368 N.W.2d 906, 910 (Minn.1985). Some element of fault or wrongful conduct must be shown, and "the court will weigh the public interest frustrated by the estoppel against the equities of the case." *Id.*

▪ The statements made by the department were obviously general responses to the providers' extremely specific questions. As the Commissioner noted, providers could not reasonably rely on such general statements by taking actions they perceived would enable them to avoid the effects of the four percent reduction. The formula ultimately adopted is consistent with the March 1983 bulletin, which was the first specific information given the providers. Under the circumstances, there was no wrongful conduct by the department, and it is not inequitable to permit the department to calculate paybacks by the method used. This is clearly not an appropriate case for estoppel.

**IV**

Residential Alternatives bought a private residence and converted it into a facility. It incurred costs to make modifications required by state and federal law. DHS disallowed the depreciation for life safety equipment installed before the facility opened. The Commissioner confirmed this decision.

▪ Residential Alternatives contends that the costs are allowable under the rules and that a past instance in which DHS allowed such costs estops DHS from disallowing them. The total basis of depreciable assets acquired to satisfy initial operating requirements is subject to certain limits (the investment-per-bed limitation). *See* Minn.R. 9510.0770(A). Depreciation on modifications and new equipment is permitted if the modifications or equipment are required by local, state, or federal requirements. *See* Minn.R. 9510.0770(D). Under the rule the life safety equipment is clearly subject to the investment-per-bed limitation.

The administrative law judge found that on two occasions DHS made allowances for initial investments. He also found three instances where DHS enforced the rules. One instance where DHS allowed the costs occurred prior to the rule. A second was an admitted mistake. Residential Alternatives made no showing of fault or wrongful conduct, and estoppel will not apply. *See Brown,* 368 N.W.2d at 910.

**DECISION**

The Commissioner's order is affirmed in all respects.

Affirmed.°

POPOVICH, C.J., dissents.

POPOVICH, Chief Judge (dissenting).

I respectfully dissent for the following reasons:

---

**4.** Residential Alternatives, Inc., spent a good deal less money than it received for the 1983 fiscal year. The record shows that Residential Alternatives, Inc., had $63,538 in excess revenues over expenditures *after* accounting for the payback.

1. I agree with the administrative law judge's findings and conclusions. The Commissioner erred in rejecting them under the circumstances here. I would remand to the Commissioner for a determination which would leave no impact beyond June 30, 1983.

2. 1982 Minn.Laws, Third Special Session, ch. 1, art. II, § 2, subd. 4 was enacted to reduce the general fund appropriation by a specific amount. The medical assistance portion was to be reduced by $5,200,000. The interpretation of the legislation adopted by the Department and affirmed by the majority assures that not only will the medical assistance appropriation be reduced for the six month period from January 1 to June 30, 1983, but it will be reduced as long as caps are in effect. There should be no long-term ramification from an obvious short-term measure.