In the Matter of the Application of Q PETROLEUM (Leak Nos. 375, 404, 455, 521, 522, 523), George Kucera (Leak No. 81), Johnson Auto Repair (Leak No. 1015), Jack's Standard—Watkins (Leak No. 224), Superstore, Inc. (Leak No. 441), Elmer Anderson (Leak No. 242), Edwards Oil, Inc. (Leak No. 58), Severson Oil Co. (Leak No. 1172), H & L Oil Co. (Leak No. 729), Gehl Oil Company (Leak No. 721), Jack's Standard—Eden Valley (Leak No. 225), Crown CoCo, Inc.—Prior Lake (Leak No. 180), Corey Oil Co. (Leak No. 190), Crown CoCo, Inc.—Smith E–Z Stop (Leak No. 158), Hassett Oil Co., Inc. (Leak No. 567), Wally's Oil Company (Leak No. 89), Hanson Oil Company (Leak No. 29), Brownton Oil (Leak No. 27), Solheim Oil Company (Leak No. 56), Staples Oil Company (Leak No. 33), Shaver & McCarthy (Leak No. 269), Bill Clark Oil Co. (Leak No. 374), Big Lake Direct Services, Inc. (Leak No. 604), James Robertson (Leak No. 311), North Shore Oil, Inc. (Leak No. 1281), Sigfrinious (Leak No. 71), Hegstad Oil Company (Leak No. 394), Harland's Tire & Auto Center (Leak No. 369), Moberg's, Inc. (Leak No. 773), Dostal & Oleson Oil Company (Leak No. 2220), St. Michael Oil Co. (Leak No. 397), Local Oil Company—Hastings (Leak No. 1388), Matheny Oil Company (Leak No. 1162), Crown CoCo—Royalton (Leak No. 216), New Auburn Oil (Leak No. 429), Matson Distributing (Leak No. 46), Rau Corporation (Leak No. 680), Inter–City Oil (Leak Nos. 1032, 1370, 840, 1235).

Nos. C6–92–2177, C0–92–2188.

Court of Appeals of Minnesota.

April 20, 1993.

Review Denied July 15, 1193.

---

**774**

Jon S. Swierzewski, Gregory E. Korstad, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for relator Q Petroleum.

Laura J. Hanson, Meagher & Geer, Minneapolis, for all relators other than Q Petroleum.

Hubert H. Humphrey, III, Atty. Gen., Prentiss Cox, Sp. Asst. Atty. Gen., St. Paul,

for Minnesota Petroleum Tank Release Compensation Bd.

Considered and decided by CRIPPEN, P.J., and RANDALL and FOLEY,* JJ.

## OPINION

FOLEY, Judge.

Relators seek review of decisions by the Minnesota Petroleum Tank Release Compensation Board which denied reimbursement of costs to clean up petroleum leaks. We affirm.

## FACTS

The Minnesota Legislature enacted the Minnesota Petroleum Tank Release Cleanup Act (Act), Minn.Stat. §§ 115C.01–.10, in 1987. The Act governs the installation and maintenance of underground petroleum storage tanks. It provides for state action to prevent or correct health and environmental damage resulting from releases from underground storage tanks, as well as the mechanics by which cleanups are accomplished and financed. The Act created the Petroleum Tank Release Cleanup Account (Petrofund) and the Petroleum Tank Release Compensation Board (Board). Minn.Stat. §§ 115C.07, 115C.08 (1990).

The Petrofund was established to partially reimburse "responsible persons" under the Act who participate in cleaning up releases from underground storage tanks. Petrofund is funded by a fee imposed on the use of underground storage tanks containing petroleum products. Minn.Stat. § 115C.08.

The Act authorizes the Board to promulgate rules

regarding its practices and procedures, the form and procedure for applications for compensation from the fund, procedures for investigation of claims and specifying the costs that are eligible for reimbursement from the fund.

Minn.Stat. § 115C.07, subd. 3(a).

After the enactment of the Act, the Board established a policy of not reimbursing the expenses of responsible persons who had insurance covering corrective action costs. The Board did not, however, formally propose or adopt a rule to implement this policy. In *Application of Crown CoCo, Inc.*, 458 N.W.2d 132, 136–37 (Minn. App.1990), this court held that the Board's decision that insured costs were not reimbursable was a "rule" which had to be promulgated pursuant to the Administrative Procedure Act. This court further held that, in the absence of a properly promulgated rule, the Board erred in refusing to reimburse Crown CoCo for insured cleanup costs. *Id.* at 139.

During the 1991 Minnesota legislative session, the legislature approved an amendment to the Act to prevent Petrofund reimbursement for corrective action costs which are payable under an insurance policy. 1991 Minn.Laws ch. 294, § 2. The amendment became effective June 2, 1991 and applied to "applications pending on or filed after that day." 1991 Minn.Laws ch. 294, § 4.

The relators in this case seek reimbursement from the Board for cleanup costs which were paid by insurance. Q Petroleum (Q) seeks reimbursement for several leak sites. The remainder of the relators are insured by Federated Mutual Insurance Company (Federated).

Q submitted original and supplementary applications to the Board for six leak sites. Most of the original applications were rejected on the basis that Q had insurance coverage which would provide reimbursement for some of the costs. After the *Crown CoCo* decision, Q submitted supplemental applications, again seeking reimbursement for cleanup costs which were at least partially covered by insurance. After delays by the Board, the amendment to the Petrofund law which specifically disallowed reimbursement for insured costs became effective.

The Federated insureds also submitted applications for reimbursement of insured cleanup costs. At the May 30, 1991 Board meeting, Board member Brian Ettesvold

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

moved to table most of the applications for reimbursement that were scheduled to be approved at that meeting. The motion passed.

Three Federated insureds—George Kucera, Jack's Standard–Watkins and Johnson Auto Repair—had submitted applications to the Board on September 27, 1990, September 24, 1990 and January 16, 1991. These three applications were scheduled to be considered at the May 30, 1991 Board meeting.[1] Board staff recommended reimbursement in the amounts of $68,174.87, $47,282.18 and $35,344.92 respectively. Federated asserts that Ettesvold was aware that the Governor would sign chapter 294, the amendment to the Act, within a few days and, as a result, he moved to table these applications for "unstated and unsupportable deficiencies" so that the reimbursement would be denied after the bill was signed into law. The minutes of the meeting state the reason for tabling the applications:

> Mr. Ettesvold stated that some of the applications were incomplete and some costs contained in the applications were unreasonable. Mr. Svanda seconded the motion. Jeanne Hankerson of Federated Insurance asked if the staff would send letters to the applicants explaining why the applications were tabled. Mr. Ettesvold amended his motion to read that staff would send a letter to the applicants and that he (Mr. Ettesvold) would provide a description of the problems or incomplete information in question.

The amendment became effective June 2, 1991. The May 30 Board meeting resumed on June 21, 1991. Ettesvold moved to table the applications again in order to obtain an opinion from Board counsel regarding whether the denial of insured costs was appropriate in light of the effective date of the amendment.

On July 2, 1991, Board counsel Ken Raschke directed a memorandum to the Board concluding that the amendment applied to all applications which had not been finally acted upon by the Board by June 2, 1991. He presented this opinion at the July 11, 1991 Board meeting. At the July 11,

1991 meeting and at subsequent meetings, pursuant to Board counsel's opinion, reimbursement for costs covered by insurance was denied. All of relators' applications for reimbursement were denied at the June 12, 1992 Board meeting and meetings thereafter.

Both Q and the Federated insureds appealed the denial of their applications for reimbursement. The agency instituted a contested case hearing procedure. The parties stipulated to facts and submitted briefs. No hearing was held. The administrative law judge issued findings of fact, conclusions of law and a recommendation on July 7, 1992, finding that the Board properly denied reimbursement. The relators filed exceptions and the Board adopted the ALJ's recommendations by order dated October 1, 1992. Relators petitioned for writ of certiorari and this appeal followed.

## ISSUES

1. Did the Board err in refusing to reimburse costs resubmitted by Q in supplemental applications that had been submitted in Q's original reimbursement applications and denied by the Board?

2. Did the Board err in waiting over three months to respond and advise Q of deficiencies in its applications?

3. Did the Board act arbitrarily and capriciously in determining that the inclusion of invoices in Q's supplemental applications and the inclusion of all but minimal back-up documentation constitute deficiencies in Q's application?

4. Did the Board err in determining that Q failed to make the showing necessary to apply equitable estoppel?

5. Did the Board act arbitrarily and capriciously in tabling Federated's insureds' applications at the May 30, 1991 Board meeting?

6. Did the Board err in determining that its requirement of corrective action design approval documentation was not an interpretive rule?

7. Did the board exceed its statutory authority and violate its own rules in fail-

---

**1.** Other insured applications were tabled at that meeting, but these applicants have not appealed.

ing to consider applications 30 days after their complete submission?

8. Is the 1991 amendment to the Minnesota Petroleum Tank Release Cleanup Act unconstitutional?

a) Does the amendment violate relators' right to equal protection?

b) Does the amendment violate the due process clause because it is void for vagueness?

c) Does the amendment violate the due process clause because it retroactively divests relators of a vested right?

## ANALYSIS

The decision in a contested case proceeding under the Minnesota Administrative Procedure Act may be reversed or modified if the decision is

(a) in violation of constitutional provisions; or

(b) in excess of the statutory authority or jurisdiction of the agency; or

(c) made upon unlawful procedure; or

(d) affected by other error of law; or

(e) unsupported by substantial evidence in view of the entire record submitted; or

(f) arbitrary or capricious.

Minn.Stat. § 14.69 (1992). Agency decisions are presumed to be correct and courts show deference to the agencies' expertise and special knowledge in their field. *City of Moorhead v. Minnesota Pub. Utils. Comm'n*, 343 N.W.2d 843, 846 (Minn.1984).

### I. *Q Petroleum's Applications*

Q Petroleum alleges the Board made the following errors in refusing to reimburse its insured costs of corrective action. The errors alleged are unique to Q's applications.

### A. Costs Contained in Original Reimbursement Request

Q contends the Board erred in denying reimbursement for eligible costs of corrective action which were contained in Q's original applications. Q argues that Minn.R. 2890.0090, subpt. 3 (1991) allows for inclusion of these previously denied costs in a supplemental reimbursement application. The rule provides in relevant part:

An eligible responsible person or volunteer who has already obtained partial reimbursement from the board and who has incurred *additional or continuing eligible costs* due to the same release may reapply if:

A. the amount of the person's original reimbursement was less than 90 percent of the eligible costs up to $250,000.

B. the eligible costs submitted on a subsequent application are not related to any new releases at the site.

Minn.R. 2890.0090, subpt. 3 (emphasis added).

Q contends that "continuing eligible" costs are those costs which were eligible for reimbursement in a prior application and are properly submitted in a supplemental application. The Board argues that excluding Q's supplemental application costs previously denied by the Board is a reasonable construction of the rule.

When a decision turns on the meaning of the words in a regulation, a legal question is presented. *St. Otto's Home v. Minnesota Dep't of Hum. Servs.*, 437 N.W.2d 35, 39 (Minn.1989). In considering such a question of law, this court is not bound by the decision of the agency and need not defer to agency expertise. *Id.* at 39–40. However, when the agency's construction of its own regulation is at issue, this court gives considerable deference to the agency interpretation, especially when the relevant language is unclear or susceptible to different interpretations. *Id.* at 40. If the regulation is ambiguous, the agency interpretation will generally be upheld if it is reasonable. *Id.* If the regulation is not ambiguous, no deference is given to the agency interpretation and the court may substitute its own judgment. *Id.*

This court does not have to decide which construction is better. Since the rule is ambiguous, we need only to determine that the Board's construction is a reasonable one, which we do. This approach is consistent with the recognition that this issue involves the agency's own regulation as well as a core area of the Board's responsibilities. *See* Minn.Stat. § 115C.07, subd. 3(a) (authorizing Board to

promulgate rules regarding the costs that are eligible for reimbursement).

## B. Board's Delay

■ Q argues that the Board's delay of over three months in responding and advising Q of the deficiencies constitutes an error of law. Q bases this argument on the following provision in Minn.R. 2890.-0100, subpt. 1 (1991):

> The board's staff shall review all applications. If the staff finds that the application is incomplete or otherwise deficient, the staff shall *promptly* advise the applicant of the incompleteness or deficiency. Further processing of the application affected by the deficiency shall be suspended until the applicant has supplied the necessary information or otherwise corrected the deficiency.

(Emphasis added). Q contends that a three-month delay does not qualify as "promptly" advising them of the deficiencies and thus it should be reimbursed for all costs denied as a result of the Board's delay.

As the Board correctly notes, the rule does not provide any consequences for failure to comply with the rule's requirement. Thus, we hold the language is merely directory. *See Crown CoCo*, 458 N.W.2d at 138 (noting that the absence of a penalty in the administrative rule for failure to comply led court to construe the language as directory only).

## C. Inclusion of Invoices

■ Q asserts that the Board acted arbitrarily and capriciously in determining that the inclusion of invoices in Q's supplemental application which were included in the original applications and the inclusion of all but minimal amounts of back-up documentation constituted deficiencies in its application. Q argues that the Board could have and should have processed the supplemental applications and reduced the awarded reimbursement by the amounts previously paid and for which duplicate invoices had been submitted.

Q points to no statutory or rule language entitling it to have its application treated in this manner. Absent statutory or rule language which requires such treatment, we

will not impose such a condition on the Board.

## D. Equitable Estoppel

■ Q contends that even after the effective date of the amendment, the Board still represented by their conduct that the insured costs submitted in Q's supplemental applications would be reimbursed. Q urges this court to hold that the Board should be estopped from denying reimbursement of Q's insured costs or, at a minimum, that the Board compensate Q for the costs relating to Q's detrimental reliance.

> Estoppel is
> an equitable doctrine addressed to the discretion of the court and is intended to prevent a party from taking unconscionable advantage of his own wrong by asserting his strict legal rights. To establish a claim of estoppel, plaintiff must prove that defendant made representations or inducements, upon which plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed.

*Northern Petrochemical Co. v. United States Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn.1979). The government may be estopped if justice requires, but the Minnesota Supreme Court has said that it does not "envision that estoppel will be freely applied against the government." *Mesaba Aviation Div. v. County of Itasca*, 258 N.W.2d 877, 880 (Minn.1977). In order to estop a government agency, some element of fault or wrongful conduct must be shown. *Brown v. Minnesota Dep't of Pub. Welfare*, 368 N.W.2d 906, 910 (Minn. 1985). A party seeking to estop a government agency has a heavy burden of proof. *Id.* When deciding whether estoppel will be applied to the government, the court will weigh the public interest frustrated by the estoppel against the equities of the case. *Id.*

■ It is important to note that relators do not allege any bad faith conduct on the part of the Board. Furthermore, the case was tried before the ALJ on stipulated facts and there was no finding of wrongdoing in the stipulated facts. Relators seem

to want us to imply misrepresentation, but we refuse to do so. Relators' interpretation of the doctrine of estoppel would result in a large and unjustified expansion of the doctrine. Thus, we hold the Board is not estopped in this case.

## II. *Federated Insureds' Applications*

Federated alleges the Board made the following errors in refusing to reimburse its insured costs of corrective action. The errors alleged are unique to Federated's insured's applications.

### A. Tabling of Applications

■ Federated contends the Board's decision to table its applications on May 30, 1991 was arbitrary and capricious. Federated claims the decision to table the applications as "incomplete" or where costs were "unreasonable" represent the will of Ettesvold and not the judgment of the Board.

An agency decision is arbitrary or capricious where "its determination represents its will and not its judgment." *Markwardt v. State, Water Resources Bd.*, 254 N.W.2d 371, 374 (Minn.1977). Federated relies on *Burnett v. Stearns County Welfare Bd.*, 370 N.W.2d 452 (Minn.App.1985). In *Burnett,* the court held that the Stearns County Welfare Board had acted arbitrarily and capriciously by rejecting without comment the Minnesota Merit System Council's recommendation to grant Burnett a one-step merit increase. *Id.* at 455. The court stated:

"When an agency rejects or significantly deviates from the [reviewing authority's] findings, it should explain, on the record, its reasons for doing so. Failure to do so evidences the agency's desire to exercise its will and not its judgment."

*Id.* (citations omitted). In this case, the Board argued and the ALJ agreed that Ettesvold stated his reasons for tabling the applications despite staff recommendations for reimbursement on the record. Federated considers the reasons given for tabling the applications "illusory."

Even on May 30, some of the claims were paid. This is evidence that the Board was not acting arbitrarily and capriciously. Furthermore, unlike in *Burnett*, the Board

did explain the reasons for its actions. Accordingly, we hold the Board did not act arbitrarily and capriciously in tabling the applications.

### B. Requirement of Formal CAD Approval Letter

■ Federated submitted six applications in late 1990 and early 1991 (five of these were submitted in September of 1990). These applications were rejected for insufficient MPCA approval of a "Corrective Action Design" (CAD).

Rule 2890.0090, subpt. 1 (1989), sets forth the requirements for an application:

**Applications.** A person who requests compensation from the fund shall complete, sign, and submit to the board a written application. The application shall be made on a form prescribed by the board and shall contain at least the following:

A. the name of the person making the application;

B. a description of the site of the release;

C. a copy of the corrective action plan and the commissioner's approval of the plan; and

D. an itemized list of all corrective actions taken, the eligible costs associated with the actions, and the name of the engineer, contractor, or subcontractor who performed the action.

Federated argues the Board exceeded its statutory authority and violated its own rules when it required Federated to submit a formal CAD letter or closure letter before its application would be considered. Federated contends this requirement is invalid since it constitutes an interpretive rule which must be promulgated according to rulemaking procedures.

The ALJ recognized that the Petrofund Board had changed its policy regarding MPCA CAD approval:

Prior to September of 1990 the Board staff recommended reimbursement for applicants who had conceptual CAD approval but no formal letter from the PCA and several Federated insureds received reimbursement without a CAD approval letter or closure letter. Beginning in

September of 1990 the Board staff began rejecting applications which lacked formal PCA approval.

The ALJ rejected the argument that the policy change was improper and stated in its memorandum:

As the Board staff points out, however, even if there were a shift in emphasis as to exactly what was required this would not amount to any dramatic new policy. The statute and rules plainly require the Board to determine that the PCA has approved a corrective action plan. The Board staff's actions in this regard were consistent with a plain meaning of the statute and rule and therefore do not constitute improper rulemaking. It is therefore determined that the Board staff's action in requiring a formal PCA approval letter before submission of the application to the Board for action was not contrary to, but rather consistent with statute and rule.

(Citations omitted).

The term "rule" means "every agency statement of general applicability and future effect * * * adopted to implement or make specific the law enforced or administered by that agency." Minn.Stat. § 14.02, subd. 4 (1992). Rules must be adopted in accordance with the rulemaking requirements of the Minnesota Administrative Procedure Act. Minn.Stat. § 14.05, subd. 1 (1992). An agency interpretation that "make[s] specific the law enforced or administered by the agency" is an interpretive rule that is valid only if promulgated in accordance with the Minnesota Administrative Procedure Act. *Mapleton Community Home, Inc. v. Minnesota Dep't of Human Servs.*, 391 N.W.2d 798, 801 (Minn. 1986) (quoting *Minnesota–Dakotas Retail Hardware Ass'n v. State*, 279 N.W.2d 360, 364 (Minn.1979)). An agency's interpretation will not always constitute a new rule:

[I]f the agency's interpretation of a rule corresponds with its plain meaning, or if the rule is ambiguous and the agency interpretation is a longstanding one, the agency is not deemed to have promulgated a new rule.

*Cable Communications Bd. v. Nor–West Cable Communications Partnership*, 356 N.W.2d 658, 667 (Minn.1984).

Federated contends the requirement is contrary to the plain language of the statute.

The Board argues that the statute and rule "undeniably require a document from the MPCA approving a corrective action plan used for the applicant's cleanup work." The Board notes that nothing in the record shows that these six Federated insureds ever submitted any document from the MPCA approving the applicants' corrective action plans. The Board asserts it never required a specific form or particular language to establish CAD approval, but did require some document from the MPCA approving the applicants' corrective action plan.

The Board notes the record shows no evidence it required specific language in the CAD approval letter. It contends the record only shows that it declined to accept as complete six applications lacking a CAD approval letter. It argues that five of the six did not have any form of approval letter and the sixth had a letter granting approval for something other than a corrective action plan.

It is clear that the rule requires some document from the party applying for reimbursement indicating MPCA approval. We are satisfied that the Board required merely some form of letter, and the applicants did not provide anything of the sort. Even if relators are correct in alleging the Board required a formal CAD letter, and that this requirement was too stringent, our conclusion would be the same. Even under a lesser requirement, the applications would have been incomplete. Thus, the Board did not act improperly in requiring CAD approval.

### C. Board's Failure to Consider Application Within 30 Days After Complete Submission

■ Federated asserts the Board exceeded its statutory authority and violated its rules when it failed to consider the applications 30 days after their complete submission.

Federated claims the Board's rules only envisioned applications would be pending for 30 days prior to each Board meeting.

It bases this argument on Minn.R. 2890.-0090, subpt. 2, which provided: [2]

> The application and all accompanying documentation must be received by the board's office 30 days before a board meeting in order for reimbursement to be considered at that meeting. The board may waive the 30–day requirement, if it finds that undue financial hardship to the applicant will result if action is delayed until the next regular meeting.

Federated also notes that the rules require the MPCA to provide the Board with a written report regarding the responsible party's compliance with Minn.Stat. § 115C.09 within 15 days after notification that the Board received the application. *See* Minn.R. 2890.0090, subpt. 6.

Federated contends that, as a result of the Board's failure to comply with the time frame set forth in its own rules, the term "pending" is rendered ambiguous. We do not find the term "pending" to be ambiguous. Further, the rule cited by relators only makes demands of applicants, not the Board. Thus, the Board did not act improperly in failing to consider the applications within 30 days.

### III. *Constitutionality*

Relators allege that the amendment is unconstitutional because: (1) on its face and as applied, it violates their right to equal protection (2) it is void for vagueness, in violation of the due process clause, and (3) the retroactive effect violates the due process clause.

Statutes are presumptively constitutional. *In re Tveten*, 402 N.W.2d 551, 556 (Minn.1987). A reviewing court will not strike down a statute unless the party challenging the statute's constitutionality has demonstrated beyond a reasonable doubt that it violates a constitutional provision. *Id.*

### A. Equal Protection

■ Q contends the amendment violates the equal protection clause since it draws a distinction between those whose costs are covered by insurance and those whose costs are not covered by insurance. Q claims that this classification is not rationally related to a legitimate government objective.

An economic classification will be upheld if it is rationally related to a legitimate government objective. *Crown CoCo*, 458 N.W.2d at 138. Application of the rational basis test requires answering two questions: (1) does the legislation have a legitimate purpose? and (2) does the legislation bear a rational relationship to its purpose? *Id.*

The court in *Crown CoCo* found the record in the case before it contained two rational bases supporting Petrofund's denial of reimbursement to responsible persons who were already insured: (1) reimbursing persons who were already insured would result in a double recovery either to the responsible person or to their insurance company, and (2) the Act was intended to provide an incentive to responsible persons to clean up releases of petroleum into the environment, but no such incentive is necessary where the responsible persons are already insured for the damage. *Id.* Thus it concluded that the Petrofund classification did not violate the equal protection clause. *Id.*

A claim by an insurance company to get reimbursed is not in keeping with the spirit of the law. The law was not enacted in order to reimburse insurance companies. The purpose of the Act was to provide an incentive for people to clean up spills, not to provide a basis for subrogation. The statute easily withstands the minimal scrutiny economic legislation requires.

### B. Vagueness

■ Q claims that the term "pending" of the amendment is unconstitutionally void for vagueness.

Section 4 of the amendment provides: Sections 1, 2 and 3 are effective the day following final enactment and apply to

---

2. In 1991, the legislature changed the deadlines for consideration of applications. *See* Minn. Stat. § 115C.09, subd. 2(b) (Supp.1991). Federated notes that since the effective date of that section was October 1, 1991, none of these applications were considered under the amended statute.

applications pending on or filed after ·that day.

1991 Minn.Laws ch. 294.

This court does not find the term "pending" in this case to be vague. The Board merely declined to reimburse applications which had not been finally acted upon by the effective date of the amendment. Thus, the statute is not unconstitutionally void for vagueness.

### C. Retroactive Effect

 Q claims that the retroactive effect of the amendment improperly divests a "private vested interest."

The Board first argues that the statute is not retroactive. The Board further argues that, even if the statute is retroactive, it is valid since Q has no vested right.

Retroactive legislation is prohibited by the Fourteenth Amendment "when it divests any private vested interest." *Holen v. Minneapolis–St. Paul Metropolitan Airports Comm'n,* 250 Minn. 130, 137, 84 N.W.2d 282, 287 (1957). The right claimed, however, must in fact be vested:

"[A] right is not 'vested' unless it is something more than a mere expectation, based on an anticipated continuance of present laws. It must be some right or interest in property that has become fixed or established, and is not open to doubt or controversy."

*Olsen v. Special Sch. Dist. No. 1,* 427 N.W.2d 707, 711 (Minn.App.1988) (citation omitted). *See also Snortum v. Snortum,* 155 Minn. 230, 233, 193 N.W. 304, 306 (1923) (a "vested right" or "vested inter-

est" means "some right or interest in property that has become fixed or established"). There is no mature or vested right in an existing law or action until a final judgment has been entered. *McClelland v. McClelland,* 393 N.W.2d 224, 227 (Minn. App.1986), *pet. for rev. denied* (Minn. Nov. 17, 1986).

The Minnesota Supreme Court in addressing the issue of vested interests and amendatory legislation has stated:

When the legislature changes the law while a case is pending, but prior to the rendition of judgment, the court may not perpetuate the old law but must apply the new. There is no vested right in an existing law nor in an action until *final* judgment has been entered therein.

*Holen,* 250 Minn. at 136–37, 84 N.W.2d at 287 (emphasis in original). Similarly, in the present case, the parties have no right to reimbursement until the Board finally acts on their applications. Since the Board had not finally acted on their applications when the amendment went into effect, they had no vested right which would be constitutionally protected.

### DECISION

The Minnesota Petroleum Tank Release Compensation Board did not err in denying relators' requests for reimbursement of costs incurred in cleaning up the petroleum leaks.

**Affirmed.**