In the Matter of the LAWFUL GAM-
BLING LICENSE OF EAGLES AERIE
2341, DETROIT LAKES, MN LICENSE
NO. 00548, Realtor,

v.

STATE of Minnesota LAWFUL
GAMBLING CONTROL
BOARD, Respondent.

No. C2–94–2522.

Court of Appeals of Minnesota.

July 3, 1995.

Kevin P. Staunton, Sheila T. Kerwin, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., E. Joseph Newton, Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by HUSPENI, P.J., and NORTON and KLAPHAKE, JJ.

## OPINION

KLAPHAKE, Judge.

Eagles Aerie 2342 (relator), a gambling organization, appeals by writ of certiorari respondent Minnesota Lawful Gambling Control Board's (the board) decision to deny its request to transfer gambling funds into its general account. The board decided the transfer was unjustified because it was a reimbursement for a previous transfer of nongambling funds to the gambling account when no "emergency" existed. In making its decision, the board applied a different definition of "emergency" than the definition contained in its own rules. Therefore, we reverse.

## FACTS

Relator is a nonprofit organization that has been conducting lawful gambling since 1985. On three occasions, May 28, 1991, February 21, 1994, and March 4, 1994, relator transferred funds from its general account into its gambling account because it had insufficient funds in its gambling account to pay taxes. The total amount transferred was $33,950.61. On August 18, 1993, relator made a $5,000 partial repayment to the general fund from the gambling account.

In March 1994, a committee of the board, "The Compliance Review Group" (the CRG), reviewed relator's gambling operation. The CRG produced a lengthy report detailing violations of the gambling rules, one of which was "fund transfers without board approval." The CRG required that relator reimburse the gambling account from nongambling funds for the $5,000 transfer.

Relator responded to the report, and then the CRG conducted a post-compliance review. In the post-compliance review report,

the CRG noted that the $5,000 still had not been repaid to the gambling account; relator had documented the initial $33,950.61 transfers from the general account into the gambling account; relator's reason for these transfers was to pay taxes due; and relator planned to request board permission to reimburse the general account from the gambling account. The CRG ordered that relator discontinue its practice of transferring monies between funds.

After relator and the CRG conferred, they executed a consent order. The order specifically itemized the violations of gambling rules, including the $5,000 transfer from the gambling account into the general account. With regard to that transfer, relator had express leave to request retroactive approval from the board. If the board denied the request, relator was to reimburse the gambling account $5,000.

Relator then formally requested board permission to repay the entire $33,950.61, including the $5,000 previously borrowed from the general account to pay taxes. The board denied the request on November 21, 1994. The board's reasoning was that "bad business acumen" did not constitute an "emergency" authorizing the original transfer under its bank account rules and therefore the subsequent reimbursement was unauthorized.

## ISSUE

Did the Minnesota Lawful Gambling Control Board correctly apply its definition of "emergency" under its bank account rules?

## ANALYSIS

The board has promulgated rules governing gambling organizations' bank accounts. Minn.R. 7861.0120, subpt. 4 (1993). The rules further the legislative mandate that the

[g]ross receipts from lawful gambling * * * be segregated from all other revenues * * * and placed in a separate account [and] [a]ll expenditures for expenses, taxes, and lawful purposes must be made from the separate [gambling] account except in the case of expenditures previously

approved by the organization's membership for emergencies as defined by Board rule.

Minn.Stat. § 349.19, subd. 2 (1992). The board defines "emergency" as "a financial obligation due and payable which if not met would require the organization to cease gambling." Minn.R. 7861.0120, subpt. 4 (1993).

The meaning of the board's bank account rule and its definition of "emergencies" presents a legal question. *See In re Q Petroleum*, 498 N.W.2d 772, 777 (Minn.App.1993), *pet. for rev. denied* (Minn. July 15, 1993). Because we find the rule clear and capable of understanding, we substitute our own judgment and do not defer to the board's interpretation. *See St. Otto's Home v. Minnesota Dept. of Human Servs.*, 437 N.W.2d 35, 39 (Minn.1989).

■ Despite the board's clear definition of an "emergency" justifying a transfer between accounts, it decided to apply a new unwritten standard: if an expenditure is caused by "bad business acumen," it does not qualify as an "emergency." Apparently, the board began applying this new standard to deny fund transfers in 1994. Although the board considers the new standard critically important, it has not adopted it as a rule. Instead, it has applied it ad hoc.

The legislature delegated authority to the board to promulgate rules on the precise issue of what constitutes an "emergency." The rulemaking method of formulating policy on this issue was the method chosen for and used by the board. Once the board adopted a rule, it had no authority to formulate conflicting or limiting policy on a case-by-case basis. *Cf. In re Contested Case of Ebenezer Soc'y*, 433 N.W.2d 436, 439 (Minn.App.1988) (once rule creating cost classifications was in effect, commissioner could not create contradictory new classification without using rulemaking process). It certainly did not have the discretion to disregard its own rule. *Springborg v. Wilson & Co.*, 245 Minn. 489, 493, 73 N.W.2d 433, 435 (1956).

■ Applying the clear and unambiguous definition of "emergency" set out in the rule, therefore, relator must establish that it had a "financial obligation due and payable which if not met would require the organization to cease gambling." Minn.R. 7861.0120, subpt. 4. It is undisputed that the financial obligation prompting each transfer was payment of gambling taxes due and payable. *See* Minn.Stat. § 349.212, subd. 2 (1992) (repealed in 1994 and now codified at Minn.Stat. § 297E.02 (1994)). The board contends that there could not be an emergency without an "immediate" threat to relator's ability to continue its gambling operation. The rule, however, has no immediacy requirement. In light of the board's broad power to deny, suspend, or revoke gambling licenses, the failure to meet a tax obligation would eventually require cessation of the operation. *See* Minn.Stat. §§ 349.155, subd. 4 (1992) (no license renewal if organization is tax delinquent); 349.1641 (summary suspension allowed if organization three months tax delinquent). We decline to read the definition of "emergency" so narrowly that relator had no opportunity to act under the rule.

## DECISION

The board's new unwritten exclusion of emergencies resulting from "bad business acumen" is inconsistent with its unambiguous definition of emergency in Minn.R. 7861.0120, subpt. 4 (1993). Because relator complied with the written rule, the board improperly denied the requested transfer.

**Reversed.**